UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Peridot Tree, Inc., et al., | No. 2:22-cv-00289-KJM-DB |
| Plaintiffs, | ORDER |
| v. | |
| City of Sacramento, et al., | |
| Defendants. | |

The plaintiffs in this action, Peridot Tree, Inc. and Kenneth Gay, claim the City of Sacramento has wrongly discriminated against interstate commerce in marijuana contrary to the "dormant" aspect of the Constitution's Commerce Clause. Congress, however, has outlawed marijuana distribution. Although that prohibition does not deprive this court of jurisdiction, in these unique circumstances, the court postpones its exercise of that jurisdiction. This action is **stayed,** as explained below.

I.   BACKGROUND

In 2016, California voted to legalize marijuana use by adults 21 and older, among other changes. *See People v. Raybon*, 11 Cal. 5th 1056, 1060 (2021); Control, Regulate and Tax Adult Use of Marijuana Act, 2016 Cal. Legis. Serv. Prop. 64 (West). The next year, the Sacramento City Council tasked the City's staff with creating a program "to address the negative impacts of disproportionate enforcement of cannabis-related regulation." Sacramento City Council Res. No.

1

2018-0323 (Aug. 9, 2018), Req. J. Not. Ex. 1 at 1, ECF No. 13-2.[1] Staff developed the "Cannabis Opportunity Reinvestment and Equity" or "CORE" program. *Id.* at 2. The CORE program describes its purpose as reducing "barriers of entry and participation" in the cannabis industry to those who "have been negatively impacted by the disproportionate law enforcement of cannabis related crimes." *Id.* at 19. It offers "cannabis business development resources, services, and contracting and shareholder opportunities." *Id.* To be eligible to participate in the CORE program, an applicant must fit within one of five defined "classifications." *See id.* at 23. Only the first two classifications are relevant to this order:

> **Classification 1.** A current or former resident of the City of Sacramento who previously resided or currently resides in a low-income household and was either: a) arrested or convicted for a cannabis related crime in Sacramento between the years 1980 and 2011; or is b) an immediate family member of an individual described in subsection a of Classification 1 or Classification 2.
>
> **Classification 2.** A current or former resident of the City of Sacramento who has lived in a low-income household for at least five (5) years, between the years of 1980 and 2011 in [nine listed zip codes]:

*Id.* Most importantly for this case, both require applicants to be current or former Sacramento residents.

After the City Council adopted the CORE program, it decided to issue "storefront cannabis dispensary" permits to applicants in the first two CORE classifications. Sacramento City Council Res. No. 2020-0338 (Oct. 13, 2020), Req. J. Not. Ex. 2 at 1, ECF No. 13-2. That is, to be eligible, a person must fit the requirements of classification 1 or 2, so an applicant must be a current or former Sacramento resident. Permits would be awarded in a competitive process, structured around a "request for qualifications" or "RFQ" process, that weighed applicants' qualifications and their likely ability "to successfully apply for and operate a storefront dispensary." *Id.* The City decided to "offer the opportunity to apply" for a permit to the ten

---

[1] The court grants the City's unopposed request for judicial notice of the resolutions and other public records cited in this order. *See* Fed. R. Evid. 201(b); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (taking judicial notice of similar records at pleadings stage).

applicants who score highest in this process. Application Form at 2, Req. J. Not. Ex. 3, ECF No. 13-2.

Peridot is a California company. First Am. Compl. ¶ 1, ECF No. 12. Gay is its majority shareholder. *Id.* ¶ 2. They applied for a dispensary license and asked to participate in the process, but the City rejected their application because they did not meet the requirements of CORE classifications 1 or 2. *Id.* ¶¶ 21–22. Gay has never lived in Sacramento. *Id.* ¶ 17. He otherwise meets the requirement of CORE classifications 1 and 2. *Id.* ¶¶ 18–19.

The City announced its top ten applicants in April 2021. *Id.* ¶ 22. Peridot and Gay allege on information and belief that all ten "are affiliated with individuals who have resided in Sacramento." *Id.* They filed this lawsuit several months after the results were announced. They claim the City's program is unconstitutional because it discriminates against out-of-state applicants in violation of the "Dormant Commerce Clause," and they seek declaratory judgment to the same effect. *Id.* ¶¶ 23–31. In addition to the declaration, their complaint requests damages, an injunction, costs, fees, and whatever other relief the court deems appropriate. *Id.* at 10.

The City moves to dismiss. *See generally* Mot., ECF No. 13; Mem., ECF No. 13-1. It argues the plaintiffs lack standing, *see* Mem. at 5–6, defends its application process as constitutional, *see id.* at 6–9, and argues the complaint is too vague to make out a viable claim, *see id.* at 9. The plaintiffs oppose that motion, *see generally* Opp'n, ECF No. 15, and the City has replied, *see generally* Reply, ECF No. 17. Before the scheduled hearing date, the court ordered the parties to submit supplemental briefs addressing whether this court should abstain from adjudicating this action, *see* Order (May 17, 2022), ECF No. 19, and the parties have filed those briefs, *see generally* Defs.' Suppl Br., ECF No. 20; Pls.' Suppl. Br., ECF No. 21. The court heard oral argument at a combined motion hearing and status conference on June 17, 2022. Mins., ECF No. 25. Christian Kernkamp appeared for the plaintiffs, and Matthew Day appeared for the City.

**II.     JURISDICTION**

The City argues first that the plaintiffs lack standing. Article III of the U.S. Constitution limits federal jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. The doctrine of standing is rooted in that limitation. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

3

Standing has three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. It must do so "for each claim" and "'each form of relief sought.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). When, as in this case, the standing question arises at the pleading stage, the plaintiff "must 'clearly . . . allege facts demonstrating' each element." *Spokeo*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 480, 518 (1975)). An organization's standing is evaluated using "the same inquiry." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)).

The court begins with the plaintiffs' claims for damages. First, Peridot and Gay have each suffered the necessary "concrete" and "particularized" injury. *Lujan*, 504 U.S. at 560. The City denied their permit application. It did not allow them to participate in its competitive process. Second, there is no question it was the City's decision to exclude them from this process. The third element also is satisfied: damages could compensate them for the potential sales the City has barred them from pursuing.

The City argues the plaintiffs do not have standing to pursue damages for two reasons. First, it points out that the "winners" of its competitive process are not guaranteed a permit. *See* Mem. at 6. The City has offered them only the opportunity to apply and compete for a permit. Application Form at 2, Req. J. Not. Ex. 3. Even if plaintiffs had been allowed to participate in the City's process, it might have denied their application in favor of a more qualified proposal. Mem. at 6. Second, the City argues that any estimation of potential profits would amount to speculation. *See* Mem. at 6.

These arguments suffer from a common flaw. Winning the 100 meter dash is no guarantee of a podium finish in a decathlon, but an athlete who is wrongly barred from starting that race has certainly been hampered in her hunt for the overall gold. Peridot and Gay similarly

fell out of the race right from the start. Here, there is a concrete injury in the necessary sense. *See, e.g.*, *NPG, LLC v. City of Portland, Me.*, No. 20-00208-NT, 2020 WL 4741913, at *6 (D. Me. Aug. 14, 2020) ("Although the Plaintiffs have not been denied a license, their alleged injury is not the denial itself but the disadvantage they face in obtaining a license due to the City's [policy]."). The amount of plaintiffs' alleged damages is uncertain, but that uncertainty does not deprive them of standing. *See, e.g.*, *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1172 (9th Cir. 2002). A claim for even nominal damages would suffice for jurisdictional purposes. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021).

In addition to damages, the plaintiffs request "an injunction prohibiting Defendants from processing any applications for storefront cannabis dispensary licenses from the requests for qualifications for cannabis storefront dispensaries held from January 20, 2021 to February 19, 2021," i.e., the period during which their application was denied. First Am. Compl. at 10. Similarly, they request a judicial declaration that the challenged resolutions are unconstitutional, that "the residency preferences may not be enforced," and that the City "may not process any applications for storefront cannabis dispensary licenses from the requests for qualifications for cannabis storefront dispensaries" over the same period. *Id.* These equitable forms of relief would redress their alleged injury by preventing the City from giving any preference to current or former local residents. Plaintiffs have standing to pursue their requests for injunctive and declaratory relief.

The court denies the motion to dismiss for lack of standing.

**III.   ABSTENTION**

Although federal courts have a "virtually unflagging obligation" to exercise their jurisdiction, *Colo. River Water Cons. Dist. v. United States*, 424 U.S. 800, 817 (1976), this obligation is not "absolute," *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). The Supreme Court has recognized a range of circumstances in which a district court "may decline to exercise or postpone the exercise of its jurisdiction." *Allegheny Cnty. v. Frank Mashuda Co.*, 360 U.S. 185, 188 (1959). It has emphasized, however, that abstention "is an extraordinary and

1   narrow exception" limited to cases in which an "order to the parties to repair to the state court
2   would clearly serve an important countervailing interest." *Id.* at 188–89.

3         This case does not fit neatly within any single abstention doctrine the Supreme Court has
4   recognized. The Court has held, however, that these doctrines are not "rigid pigeonholes into
5   which federal courts must try to fit cases." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12 n.9
6   (1987). Its abstention decisions overlap in a "complex" web and are all "designed to soften the
7   tensions inherent in a system that contemplates parallel judicial processes" in state and federal
8   courts. *Id.* Abstention doctrines "allow federal courts to give appropriate and necessary
9   recognition to the role and authority of the States. The duty to take these considerations into
10  account must inform the exercise of federal jurisdiction." *Quackenbush*, 517 U.S. at 733
11  (Kennedy, J., concurring).

12        When cases present difficult federal constitutional questions with significant implications
13  for sensitive state policies, federal courts have often declined to exercise their jurisdiction. In
14  *Burford v. Sun Oil Co.*, for example, the Supreme Court approved the district court's decision to
15  step back because parallel federal lawsuits threatened to frustrate Texas's efforts to provide a
16  uniform, specialized, and efficient system to resolve oil drilling disputes. *See* 319 U.S. 315, 318–
17  20, 327–28, 331–32 (1943). In later decisions, the Supreme Court has described its holding in
18  *Burford* as permitting a district court to abstain when federal litigation would disrupt state efforts
19  to "establish a coherent policy with respect to a matter of substantial public concern." *Colo.*
20  *River*, 424 U.S. at 814; *see also, e.g.*, *Quackenbush*, 517 U.S. at 726–27 ("*Burford* allows a
21  federal court to dismiss a case only if it presents 'difficult questions of state law bearing on policy
22  problems of substantial public import whose importance transcends the result in the case then at
23  bar,' or if its adjudication in a federal forum 'would be disruptive of state efforts to establish a
24  coherent policy with respect to a matter of substantial public concern.'" (quoting *New Orleans*
25  *Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989))).

26        Similarly, in *Louisiana Light & Power v. City of Thibodaux*, 517 U.S. 706 (1959), the
27  Supreme Court held that "federal courts have the power to refrain from hearing . . . cases raising
28  issues 'intimately involved with the States' sovereign prerogative, the proper adjudication of

which might be impaired by unsettled questions of state law." *Quackenbush*, 517 U.S. at 716–17 (quoting *Thibodaux*, 360 U.S. at 28)). Whether or not this doctrine is separate from what the Supreme Court described in *Burford*, its motivation is the same: federal courts should abstain from adjudicating certain cases if the state court is in a better position to protect the state's interests. *See Hawthorne Sav. F.S.B. v. Reliance Ins. Co. of Ill.*, 421 F.3d 835, 846 n.9 (9th Cir. 2005), *amended on other grounds*, 433 F.3d 1089 (9th Cir. 2006).

The abstention doctrine of *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), rests on similar concerns. The Supreme Court held in *Pullman* that federal district courts may abstain from adjudicating a federal constitutional issue that "might be mooted or presented in a different posture by a state court determination of pertinent state law." *Allegheny Cnty.*, 360 U.S. at 189. Under the contemporary expression of this doctrine, a district court may abstain if (1) the case concerns "a sensitive area of social policy upon which the federal courts ought not enter unless no alternative to its adjudication is open," (2) "a definite ruling on the state issue would terminate the controversy," thus avoiding constitutional litigation, and (3) "the proper resolution of the possible determinative issue of state law is uncertain." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 783–84 (9th Cir. 2014) (quoting *Porter v. Jones*, 319 F.3d 483, 492 (9th Cir. 2003)). Uncertainty about state law is a keystone of this test: the federal court can abstain only if it "cannot predict with any confidence how the state's highest court would decide an issue of state law." *Slidewaters LLC v. Washington State Dep't of Lab. & Indus.*, 4 F.4th 747, 761 (9th Cir. 2021) (quoting *Courtney v. Goltz*, 736 F.3d 1152, 1163 (9th Cir. 2013)), *cert. denied*, 142 S. Ct. 779 (2022).

A number of other abstention doctrines rest on similar concerns about conflicts between parallel federal and state proceedings. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995) (holding district courts may stay action for declaratory relief if another suit involving same parties and same state law issues is pending in state court); *Colo. River*, 424 U.S. at 817–20 (permitting abstention from federal actions that duplicate pending state case in some circumstances); *Younger v. Harris*, 401 U.S. 27, 43–44 (1971) (holding federal courts may abstain to avoid interfering with pending state criminal proceeding). "In addition, a federal court may stay its proceedings based

7

on comity even when none of the abstention doctrines requires that it do so." *Noel v. Hall*, 341 F.3d 1148, 1160 (9th Cir. 2003) (citing *Deakins v. Monaghan*, 484 U.S. 193, 202–03 (1988)).

In this case, federal and state policies collide at virtually every turn. In the first instance, California's interests loom large. For more than a hundred years, "California has been a pioneer in the regulation of marijuana." *Gonzales v. Raich*, 545 U.S. 1, 5 (2005). It was one of the first states to prohibit the possession and sale of marijuana in the early Twentieth Century. *See id.* (citing 1913 Cal. Stats. Ch. 342 § 8a). Then it was one of the first states to permit marijuana use for medical purposes. *See* Compassionate Use Act of 1996, 1996 Cal. Legis. Serv. Prop. 215 (West). Twenty years later, it was within the first group of states to permit marijuana for nonmedical purposes as well. *See* Control, Regulate and Tax Adult Use of Marijuana Act (Prop. 64), 2016 Cal. Legis. Serv. Prop. 64 (West).

California adopted its current marijuana policy by popular vote through a constitutional ballot initiative in 2016. *See* Cal. Const. Art. II § 8. According to the official voter guide for this initiative, commonly known as Proposition 64, voters made four basic changes to California law: (1) it became legal under state law for adults to use marijuana for nonmedical purposes, (2) the state adopted a regulatory system for nonmedical marijuana businesses, (3) the state began taxing marijuana, and (4) criminal penalties for marijuana-related crimes changed. *See* Voter Information Guide, General Election at 92 (Nov. 8, 2016).[2]

Proposition 64 includes a detailed explanation of its purposes, such as protecting children and the environment from the harms of a burgeoning illicit drug market, *see* Prop. 64 § 3(a), (g), (h), (j), (n), (o), (y); balancing state and local interests and preserving the authority of local governments to make their own policies and regulate land use, *see id.* § 3(d), (m); recognizing the importance of public safety and private property rights and allowing employers to make their own workplace policies for marijuana, *see id.* § 3(i), (p), (q), (r); alleviating "pressure" on the state's courts, which were "clogged with cases of non-violent drug offenses," *id.* § 2(G); resentencing defendants who would have received lesser punishment under the new regime, *id.* § 3(z);

---

[2] https://vig.cdn.sos.ca.gov/2016/general/en/pdf/complete-vig.pdf (last visited Oct. 13, 2022).

generating tax revenue, opening legal markets, and closing illegal markets, *id.* § 3(s), (t), (u), (v), (x); and "[s]trengthen[ing] the state's existing medical marijuana system," *id.* § 3(k).

These wide-reaching purposes manifest themselves in a regulatory system Proposition 64 itself describes as "comprehensive." *Id.* § 3.  The initiative added an entirely new division to the California Business & Professions Code "to establish a comprehensive system to control and regulate the cultivation, distribution, transport, storage, manufacturing, processing, and sale of nonmedical marijuana and marijuana products for adults 21 years of age and over." Cal. Bus. & Prof. Code § 26000(a) (2016).  It also amended the state's Health and Safety Code, Labor Code, Water Code, Revenue and Tax Code, and Food and Agricultural Code. *See, e.g.*, Cal. Health & Safety Code § 11362.1 (2016) (permitting possession, processing, transportation, purchase, and use of marijuana by adults); Cal. Lab. Code § 147.6(a) (2016) (directing Division of Occupational Safety and Health to "evaluate whether there is a need to develop industry-specific regulations" for newly established cannabis industry); Cal. Water Code § 13276(b) (2016) (allowing state and regional water boards to "address discharges of waste resulting from medical marijuana cultivation and commercial marijuana cultivation" under new division of Business and Professions Code); Cal. Rev. & Tax Code §§ 34011–34012 (2016) (establishing marijuana excise and cultivation taxes); Cal. Food & Ag. Code § 81010(b) (2016) (applying Food and Agricultural Code to "possession, use, purchase, sale, production, manufacture, packaging, labeling, transporting, storage, distribution, use, and transfer of industrial hemp").

As described above and in plaintiffs' complaint, Sacramento decided in the wake of Proposition 64 to devote its own resources to the new cannabis industry as well.  Its city council has explored how it can help those who suffered disproportionately under the state's former criminal prohibitions and how it can help residents enter the newly legalized industry. Sacramento City Council Res. No. 2018-0323 (Aug. 9, 2018), Req. J. Not. Ex. 1 at 1, ECF No. 13-2.

The United States' ambiguous marijuana enforcement policies stand in stark contrast with California's deliberate and extensive regulatory effort.  As then-judge Gorsuch wrote several

years ago, the federal government has been sending "mixed messages" for some time. *Feinberg v. C.I.R.*, 808 F.3d 813, 814 (10th Cir. 2015).

In the 1960s, the President of the United States declared a "war on drugs." *Raich*, 545 U.S. at 10. Ten years later, Congress passed the Controlled Substances Act, which established "a comprehensive regime to combat the international and interstate traffic in illicit drugs." *Id.* at 12. The Controlled Substances Act is "a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance" except as that law authorizes. *Id.* at 13 (citing 21 U.S.C. §§ 841(a)(1), 844(a)). The Act groups drugs "based on their accepted medical uses, the potential for abuse, and their psychological and physical effects on the body." *Id.* at 13–14 (citing 21 U.S.C. §§ 811–12). The strictest and heaviest regulations apply to drugs in "Schedule I," which Congress described as those substances that lack any accepted medical use, high abuse potential, and danger. *See* 21 U.S.C. § 812(b)(1). Congress included marijuana in this group. *See id.* § 812(c) Sched. I. "By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the manufacture, distribution, or possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration preapproved research study." *Raich*, 545 U.S. at 14 (citing 21 U.S.C. §§ 823(f), 841(a)(1), 844(a)). Virtually any marijuana transaction is unlawful under federal law: from possession to distribution to sales; even renting a room to someone "for the purpose of" using marijuana is unlawful if done knowingly. *See* 21 U.S.C. § 856(a). The government can also forfeit assets and property obtained in violation of the Controlled Substances Act's marijuana prohibitions. *See* 21 U.S.C. § 853(a)–(b).

Despite these stringent and comprehensive prohibitions, states have authorized marijuana use for medical purposes for more than twenty years. *See Raich*, 545 U.S. at 5 n.1 (citing laws and initiatives in Alaska, Arizona, Colorado, Hawaii, Maine, Montana, Nevada, Oregon, Vermont, and Washington). And "[s]ince December 16, 2014, congressional appropriations riders have prohibited the use of any DOJ funds that prevent states with medical marijuana programs (including California) from implementing their state medical marijuana laws." *United*

*States v. Kleinman*, 880 F.3d 1020, 1027 (9th Cir. 2017); *see also* Cong. Res. Serv., "Funding Limits on Federal Prosecutions of State-Legal Medical Marijuana" (Feb. 4, 2022).[3]

"[O]fficials at the Department of Justice" have also "instructed field prosecutors that they should generally decline to enforce" federal marijuana prohibitions in states like California, which permit marijuana distribution. *Feinberg*, 808 F.3d at 814. In 2009, the Deputy Attorney General issued a memorandum acknowledging "that some States have enacted laws authorizing the medical use of marijuana." *United States v. Canori*, 737 F.3d 181, 183 (2d Cir. 2013); *see also United States v. Pickard*, 100 F. Supp. 3d 981, 1010–11 (E.D. Cal. 2015); David W. Ogden, Deputy Att'y Gen., "Memorandum for Selected United States Attorneys" (Oct. 19, 2009).[4] He advised local prosecutors not to spend time and money on cases against "individuals whose actions are in clear and unambiguous compliance with existing state laws providing for the medical use of marijuana." *Canori*, 737 F.3d at 183. The Deputy Attorney General "reaffirmed" and updated this guidance in 2011 and 2013. *Id.* at 184 & n.5; *Pickard*, 100 F. Supp. 3d at 1010; James A. Cole, Deputy Att'y Gen. of the U.S., "Memorandum for All United States Attorneys" (Aug. 29, 2013).[5] His memos describe several "enforcement priorities," such as "preventing revenue from the sales of marijuana from going to criminal enterprises, gangs, and cartels," and "preventing state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity." *Pickard*, 100 F. Supp. 3d at 1010–11 (alterations and quotation marks omitted).

The prior Administration issued conflicting statements about its cannabis enforcement priorities. *See Original Invs., LLC v. State*, 542 F. Supp. 3d 1230, 1236–37 (W.D. Okla. 2021) (citing Memorandum for all United States Attorneys: Marijuana Enforcement, Office of the Attorney General (Jan. 4, 2018) and Review of the FY2020 Budget Request for DOJ, 116th Cong. (Apr. 10, 2019) (testimony of William Barr, Att'y Gen. of the United States).

---

[3] https://crsreports.congress.gov/product/pdf/LSB/LSB10694/2 (last visited Oct. 13, 2022).

[4] https://www.justice.gov/archives/opa/blog/memorandum-selected-united-state-attorneys-investigations-and-prosecutions-states (last visited Oct. 13, 2022).

[5] https://www.justice.gov/iso/opa/resources/3052013829132756857467.pdf

11

The current President stated during his campaign for office that he would "decriminalize the use of cannabis," Biden Harris, "Lift Every Voice: The Biden Plan for Black America."[6] He recently exercised his authority to "grant a full, complete, and unconditional pardon to . . . all current United States citizens and lawful permanent residents who committed the offense of simple possession of marijuana in violation of the Controlled Substances Act." Pres. Joseph R. Biden, "A Proclamation on Granting Pardon for the Offense of Simple Possession of Marijuana" (Oct. 6, 2022).[7] He announced he would ask the Secretary of Health and Human Services and the Attorney General "to initiate the administrative process to review expeditiously how marijuana is scheduled under federal law." Pres. Joseph R. Biden, "Statement from President Biden on Marijuana Reform (Oct. 6, 2022).[8] He also reiterated his position from the campaign that "no one should be in jail just for using or possessing marijuana." *Id.*

Memoranda and policies are, of course, not laws. They neither repeal the Controlled Substances Act nor remove marijuana from Schedule I. They offer "guidance" on how prosecutors should exercise their authority to enforce federal law. *See Canori*, 737 F.3d at 184. As a result, those in the business of "cultivating, selling or distributing marijuana, and those who facilitate such activities, are in violation of the Controlled Substances Act, regardless of state law," even today. *Id.* (quotation marks omitted). Executive Branch enforcement policies can and do change, even if the law remains the same. *Cf. Dept' of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1901–03 (2020) (describing recent history of Security of Homeland Security's immigration enforcement priorities). But Congress has not condemned the Executive Branch's enforcement strategy. If anything, it has approved of it by forbidding expenditures on certain enforcement actions, as noted above. *See Kleinman*, 880 F.3d at 1027. In sum, Congress and the Executive Branch have expressed little interest in strictly enforcing the comprehensive and thorough federal marijuana ban; they have expressed disinterest.

---

[6] https://joebiden.com/blackamerica/ (last visited Oct. 13, 2022).

[7] https://www.whitehouse.gov/briefing-room/presidential-actions/2022/10/06/granting-pardon-for-the-offense-of-simple-possession-of-marijuana/ (last visited Oct. 13, 2022).

[8] https://www.whitehouse.gov/briefing-room/statements-releases/2022/10/06/statement-from-president-biden-on-marijuana-reform/ (last visited Oct. 13, 2022).

The ambiguity of federal policy is only one reason to doubt the salience of the federal interests at stake in this case. The nature of Peridot and Gay's claim also rests on a shaky constitutional foundation. Plaintiffs rely on the Dormant Commerce Clause, which "prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)). Put simply, the plaintiffs ask this court to open Sacramento's borders to out-of-state marijuana sellers. But in passing the Controlled Substances Act, Congress exercised its constitutional authority to pass laws "necessary and proper" to "regulate Commerce . . . among the several States." *Raich*, 545 U.S. at 22 (quoting U.S. Const. art. I, § 8). It clearly and thoroughly prohibited almost every aspect of the market for marijuana. Congress has effectively said there should be no interstate commerce in marijuana.

Moreover, it is difficult to see what constitutional right a person could have to participate freely in illegal interstate marijuana markets. Some courts have found a constitutional right, but not without difficulty. In Maine, for example, district courts have acknowledged that Congress has criminalized interstate commerce in marijuana, but they have not seen this criminal prohibition as a license for states to target out-of-state marijuana distribution. *See Ne. Patients Grp. v. Me. Dept's of Admin. & Financial Servs.*, 554 F. Supp. 3d 177, 184 & n.9 (D. Me. 2021); *see also, e.g.*, *NPG, LLC v. City of Portland, Me.*, No. 20-00208, 2020 WL 4741913, at *10 (D. Me. Aug. 14, 2020). In Illinois, a district court acknowledged "the animating purpose of the Commerce Clause—fostering free trade among the States—does not apply with equal force" to marijuana markets. *Finch v. Treto*, ___ F. Supp. 3d ___, No. 22-1508, 2022 WL 2073572, at *14 (N.D. Ill. June 9, 2022). The court was persuaded, however, that the implicit constitutional prohibition against discriminatory state laws did not "fall out of the picture." *Id.*

These decisions rest on an exception to the ordinary Dormant Commerce Clause prohibition: federal courts excuse state laws that discriminate against interstate commerce if Congress has "expressly stated its intent and policy" to allow those laws. *New England Power Co. v. New Hampshire*, 455 U.S. 331, 343 (1982) (quoting *Prudential Ins. Co. v. Benjamin*, 328

13

U.S. 408, 427 (1946)). This exception seems an odd fit for a marijuana case. Congress has provided by statute for punishing virtually every aspect of interstate marijuana commerce criminally, while also limiting use of federal resources for some prosecutions. Having passed such a comprehensive prohibition, it would be surprising if Congress had then expressly allowed states to protect their local marijuana enterprises. *Cf. Raich*, 545 U.S. at 33 ("Given the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere and concerns about diversion into illicit channels, we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the [Controlled Substances Act]." (citations and footnotes omitted)). Suffice it so say the constitutional question is difficult and "unsettled in federal courts across the country." *See Finch*, 2022 WL 2073572, at *15.

Taking a step back, then, if this case were to proceed, the court would be forced to weigh in on a difficult constitutional dispute in which California's interests are clear and substantial: it has passed a wide-reaching and complex program designed to foster, regulate, and tax a new cannabis industry. The federal interests, by contrast, are murky: Congress has strictly and unambiguously prohibited all commerce in marijuana, but in recent years, the political branches have expressed no interest in enforcing that prohibition. The President has also called for a review of marijuana's classification on Schedule I. The constitutional right in question—the alleged right to a free-flowing interstate marijuana market—may also be a chimera; Congress has punished those who participate in that market with criminal liability.

These circumstances make a strong case for abstention. But there is yet another reason for caution. Several federal district courts have refused to "award profits from a business that grows, processes, and sells marijuana" in cases involving state law contract and similar claims. *Sensoria, LLC v. Kaweske*, No. 20-942, 2021 WL 2823080, at *8 (D. Colo. July 7, 2021). Their reasoning is straightforward: "A federal court may not compel performance of an illegal contract and may not grant relief that would compel a party to violate federal law." *Sensoria, LLC v. Kaweske*, No. 20-00942, 2021 WL 103020, at *6 (D. Colo. Jan. 12, 2021); *see also Bassidji v. Goe*, 413 F.3d

928, 936 (9th Cir. 2005) (holding in case unrelated to marijuana that "courts will not order a party to a contract to perform an act that is in direct violation of a positive law directive, even if that party has agreed, for consideration, to perform that act").

Longstanding equitable principles similarly constrain federal district courts such as this one. "A plaintiff asking a court for equitable relief 'must come with clean hands,'" *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 959 (9th Cir. 2015) (quoting *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944)), meaning a court may decline to consider a claim for equitable relief when a plaintiff has not acted "fairly," *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). This doctrine "is rooted in the historical concept of a court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith." *Id.* at 814. As a result, "in an ordinary case," a federal court should not "lend its judicial power to a plaintiff who seeks to invoke that power for the purposes of consummating a transaction in clear violation of law." *Yellow Cab*, 321 U.S. at 387. "[E]quity does not demand," however, "that its suitors shall have led blameless lives," *Loughran v. Loughran*, 292 U.S. 216, 229 (1934). Nor must courts "permit a defendant wrongdoer to retain the profits of his wrongdoing merely because the plaintiff himself is possibly guilty of transgressing the law." *Northbay Wellness Grp.*, 789 F.3d at 960 (quoting *Yellow Cab*, 321 U.S. at 387). "[T]he clean hands doctrine should not be strictly enforced when to do so would frustrate a substantial public interest." *EEOC v. Recruit U.S.A., Inc.*, 939 F.2d 746, 753 (9th Cir. 1991). In other words, two wrongs do not make a right.

Sometimes these rules are easy to apply without disrupting a state's marijuana regulations. *See, e.g.*, *Northbay Wellness Grp.*, 789 F.3d at 958–61 (declining to exercise equitable powers to benefit attorney who stole from marijuana distributor client) *Greenwood v. Green Leaf Lab LLC*, No. 17-00415, 2017 WL 3391671, at *3 (D. Or. July 13, 2017) (awarding unpaid wages to employee of marijuana distributor), *report and recommendation adopted*, 2017 WL 3391647 (D. Or. Aug. 7, 2017). This case is more like those in which federal courts have refused relief. Last year, an Oklahoma district court dismissed a case very similar to this one because it was concerned that resolving the case would require it to compel illegal actions. *See generally*

15

*Original Invs.*, 542 F. Supp. 3d 1230–34. At least two judges of the Tenth Circuit reached essentially the same conclusion in *Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, albeit in a fractured set of opinions. *See* 861 F.3d 1052, 1055 (10th Cir. 2017) (Moritz, J.); *id.* at 1066 (Bacharach, J.); *see also Sensoria, LLC v. Kaweske*, 581 F. Supp. 3d 1243, 1259–60 (D. Colo. 2022) (interpreting *Fourth Corner* as recognizing that marijuana distributors cannot obtain equitable relief due to the Controlled Substances Act); *Original Investments*, 542 F. Supp. 3d at 1235–36 (same).

To be sure, a defense along these lines has its faults. As the district court wrote in *Finch*, a state or local government that fosters a local marijuana market has sullied its hands in the same basic sense as has a marijuana distributor. 2022 WL 2073572, at *14. But the Supreme Court's decision in *United States v. Oakland Cannabis Buyers' Co-Op*, 532 U.S. 483 (2001), casts doubt on that conclusion. The Court held that federal district courts cannot employ their equitable powers if doing so would effectively revisit decisions Congress had already made when it passed the Controlled Substances Act. *See id.* at 497–98. "[A] court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'" *Id.* at 497 (quoting *Virginian R. Co. v. Railway Employees*, 300 U.S. 515, 551 (1937)). And Congress had already decided marijuana "has 'no currently accepted medical use' at all." *Id.* at 491 (quoting 21 U.S.C. § 812).

Concerns like these have led federal district courts to express unease with disputes about state cannabis regulations. *See, e.g.*, *MediGrow, LLC v. Natalie M. LaPrade Cannabis Commission*, 487 F. Supp. 3d 364, 368–70, 376 (D. Md. 2020) (declining to exercise jurisdiction over state law claims about state marijuana licensing system); *Left Coast Ventures, Inc. v. Bill's Nursery Inc.*, No. 19-1297, 2019 WL 6683518, *2 (W.D. Wash. Dec. 6, 2019) (abstaining from adjudicating marijuana licensing dispute under *Burford*); *Brinkmeyer v. Washington State Liquor and Cannabis Board*, No. 20-5661, 2020 WL 5893807 (W.D. Wash. Oct. 5, 2020) (abstaining under *Pullman* from adjudicating federal constitutional challenge to state-law cannabis licensing scheme and severing and remanding state claims). This court recently joined this group in a dispute about state law. *See Gopal v. Luther*, No. 21-00735, 2022 WL 504983, at *4 (E.D. Cal. Feb. 18, 2022) ("State courts have a greater interest in the interpretation of state laws that create

16

regulatory channels for cannabis cultivation, licensing, sales, and distribution, especially when those laws conflict with the [Controlled Substance Act].").

In this case, if this court proceeded to decide whether an unclean-hands or illegal conduct defense is viable, it would risk upending significant portions of Proposition 64. If the defense were ultimately successful, participants in the state's new cannabis industry could likely assert it in any dispute about their businesses and contracts. The costs and risks of participating in the new industry would rise. And if litigants thought their chances of prevailing on such a defense were greater in federal court, they might shop for a federal forum. California courts have not expressed similar concerns about adjudicating cannabis disputes. *See, e.g.*, *City of Riverside v. Inland Empire Patients Health & Wellness, Inc.*, 56 Cal. 4th 729, 738–40, 763 n.14 (2013) (acknowledging federal prohibitions but declining to consider conflicts between federal and state laws); *Granny Purps, Inc. v. County of Santa Cruz*, 53 Cal. App. 5th 1, 6–10 (2020) (reversing order sustaining demurrer to causes of action for return of seized marijuana plants); *City of Palm Springs v. Luna Crest Inc.*, 245 Cal. App. 4th 879, 884–85 (2016) ("[W]e find no merit in the assertion that City's permit requirement for medical marijuana dispensaries is preempted by federal law."); *Qualified Patients Assn. v. City of Anaheim*, 187 Cal. App. 4th 734, 759 (2010) ("The federal [Controlled Substances Act] does not direct local governments to exercise their regulatory, licensing, zoning, or other power in any particular way."); *City of Garden Grove v. Superior Court*, 157 Cal. App. 4th 355, 391 (2007) ("Mindful as we are of the general supremacy of federal law, we are unable to discern any justification for the City or its police department to disregard the trial court's order to return [seized] marijuana. The order is fully consistent with state law respecting the possession of medical marijuana, and for all the reasons discussed, we do not believe the federal drug laws supersede or preempt [the claimant's] right to the return of his property.").

This court cannot predict what the California Supreme Court would decide if it were asked to recognize the rights of a business that Congress has criminalized but California has fostered, regulated and taxed. On the one hand, California courts, like federal courts, have refused to compel actions that would be illegal under federal law. *See, e.g.*, *Kashani v. Tsann*

17

*Kuen China Enter. Co.*, 118 Cal. App. 4th 531, 547–48 (2004).  But on the other hand, even "illegal contracts" can be enforced in some "compelling cases." *Asdourian v. Araj*, 38 Cal. 3d 276, 292 (1985) (citing *Southfield v. Barrett*, 13 Cal. App. 3d 290, 294 (1970)).  This case and others like it may very well fit that description, given the federal government's recent ambivalence toward marijuana enforcement.

Plaintiffs in this case seem unconcerned about the likely success of an illegal conduct defense.  They filed their action in this court, they have not pursued any state-law administrative or judicial remedies, and they have argued this court should not abstain.  The implications of their decision, however, go beyond this case.  Another plaintiff may not assess its chances against an unclean-hands or illegal-conduct defense as optimistically as Peridot and Gay appear to.  The court also hesitates to wade into a murky, unresolved conflict between state and federal drug law at one particular plaintiff's urging.  California courts can and do adjudicate disputes about the dormant Commerce Clause and have vindicated foreign defendants' rights.  *See generally, e.g.*, *Pac. Merch. Shipping Ass'n v. Voss*, 12 Cal. 4th 503 (1995) (invalidating facially discriminatory state law); *Arrow Highway Steel, Inc. v. Dubin*, 56 Cal. App. 5th 876 (2020) (same), *review denied* (Feb. 10, 2021), *cert. denied*, 142 S. Ct. 1106 (2022).

The plaintiffs correctly note that several other federal district courts have not been so concerned about the consequences of exercising their jurisdiction.  *See generally, e.g.*, *Ne. Patients Grp.*, 554 F. Supp. 3d 177 (granting injunction in similar dormant Commerce Clause dispute); *Attitude Wellness, LLC v. Vill. of Pinckney*, No. 21-12021, 2022 WL 1050305 (E.D. Mich. Apr. 7, 2022) (finding plaintiff was likely to succeed with similar claims but declining to enjoin challenged law considering other relevant factors); *NPG*, 2020 WL 4741913 (granting preliminary injunctive relief in similar Commerce Clause dispute).  As the plaintiffs argue, there is little doubt those other courts had subject matter jurisdiction.  *See* Pls.' Suppl. Br. at 8.  But they did not consider whether to abstain.

Federal courts have adjudicated disputes related to marijuana and cannabis more broadly without concern about the conflicts between state law and the Controlled Substances Act.  This court recently dismissed claims by a plaintiff who alleged a local government had deprived him

of due process by enforcing zoning ordinances against cannabis cultivation. *See* Order & Judgment, *Lull v. Placer County*, No. 17-2216 (E.D. Cal. Sept. 30, 2019), ECF Nos. 42–43. And in another case, this court preliminarily enjoined county ordinances despite the county's objection that these ordinances are necessary to stop illegal marijuana cultivation. *See generally Lo v. Cnty. of Siskiyou*, 558 F. Supp. 3d 850 (E.D. Cal. 2021). In these cases, however, the plaintiffs were not attempting to recover the profits of marijuana distribution, as the plaintiffs are here. Nor were they seeking injunctive and declaratory relief that would permit them to violate the Controlled Substances Act. This critical distinction makes all the difference here.

## IV.  CONCLUSION

Abstention is the wisest course in these circumstances. States like California are experimenting with marijuana policies and programs. Those experiments are within their traditional police powers over the health, welfare, and safety of their citizens. *See Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993); *Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977). To date, Congress has neither altered federal law to permit these experiments nor expressed its disapproval. The Executive Branch has given only limited guidance. Disputes about California's foray into marijuana regulation are thus better resolved in state courts. That is especially true in this case. Although the right the plaintiffs are attempting to preserve is federal and constitutional, the object of that right is an interstate market that Congress has criminalized.

In the terms of the Supreme Court's abstention jurisprudence, this case presents difficult questions "bearing on policy problems of substantial public import whose importance transcends the result in the case at bar." *Quackenbush*, 517 U.S. at 726–27 (quoting *New Orleans Pub. Serv., Inc.*, 491 U.S. at 361). The mere availability of a federal forum risks disrupting California's efforts to "establish a coherent policy with respect to a matter of substantial public concern." *Colo. River*, 424 U.S. at 814–16. And the constitutional question, how to apply the Dormant Commerce Clause, is difficult. It is better to allow state courts to answer that question, as they are well-equipped to do. *Cf. Burford*, 319 U.S. at 334 ("Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its

1   hand."); *Noel*, 341 F.3d at 1160 ("[A] federal court may stay its proceedings based on comity even when none of the abstention doctrines requires that it do so.").

The court **abstains from exercising its jurisdiction over this case**. This action is **stayed** to permit the plaintiffs to seek relief in a California court or administrative venue of competent jurisdiction or until such time as this court may award relief consistent with federal law. The parties **shall file a joint status report** on any related litigation within 120 days and every 120 days thereafter until this court orders otherwise. All other dates and deadlines, including those related to the pending motion for a preliminary injunction, are **vacated**.

IT IS SO ORDERED.

DATED: October 17, 2022.

_____
CHIEF UNITED STATES DISTRICT JUDGE