# UNITED STATES DISTRICT COURT

**FOR THE DISTRICT OF** | EASTERN CALIFORNIA |

### Form 1. Notice of Appeal from a Judgment or Order of a
### United States District Court

U.S. District Court case number: | 2:22-cv-00289-KJM-DB |

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: | 02/14/2022 |

Date of judgment or order you are appealing: | 10/18/2022 |

Docket entry number of judgment or order you are appealing: | 36 (see attached) |

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

⦿ Yes    ○ No    ○ IFP was granted by U.S. District Court

**List all Appellants** *(List each party filing the appeal. Do not use "et al." or other abbreviations.)*

Peridot Tree, Inc.
Kenneth Gay

Is this a cross-appeal?  ○ Yes   ⦿ No

If yes, what is the first appeal case number? |                     |

Was there a previous appeal in this case?  ○ Yes   ⦿ No

If yes, what is the prior appeal case number? |                     |

Your mailing address (if pro se):

|                     |

|                     |

City: |              |  State: |      |  Zip Code: |              |

Prisoner Inmate or A Number (if applicable): |              |

**Signature** | /s/ Christian Kernkamp |  **Date** | 11/15/2022 |

*Complete and file with the attached representation statement in the U.S. District Court*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 1**                                                           *Rev. 06/09/2022*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

> Peridot Tree, Inc.
> Kenneth Gay

Name(s) of counsel (if any):

> Christian Elias Kernkamp (SBN 314928)
> Kernkamp Law, APC

Address: | 1801 Century Park East, 24th Floor

Telephone number(s): | 213-214-3030

Email(s): | ck@kernkamplaw.com

Is counsel registered for Electronic Filing in the 9th Circuit?    ● Yes    ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

> City of Sacramento
> Davina Smith

Name(s) of counsel (if any):

> SUSANA ALCALA WOOD, City Attorney (SBN 156366)
> MATTHEW R. DAY, Senior Deputy City Attorney (SBN 250945)

Address: | 915 I Street, Room 4010, Sacramento, CA 95814-2608

Telephone number(s): | (916) 808-5346

Email(s): | mrday@cityofsacramento.org.

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**<u>Appellants</u>**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?   ○ Yes   ○ No

**<u>Appellees</u>**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at* <u>forms@ca9.uscourts.gov</u>

**Form 6**                          *2*                          *New 12/01/2018*

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Peridot Tree, Inc., et al., | No. 2:22-cv-00289-KJM-DB |
| Plaintiffs, | ORDER |
| v. | |
| City of Sacramento, et al., | |
| Defendants. | |

The plaintiffs in this action, Peridot Tree, Inc. and Kenneth Gay, claim the City of Sacramento has wrongly discriminated against interstate commerce in marijuana contrary to the "dormant" aspect of the Constitution's Commerce Clause.  Congress, however, has outlawed marijuana distribution.  Although that prohibition does not deprive this court of jurisdiction, in these unique circumstances, the court postpones its exercise of that jurisdiction.  This action is **stayed,** as explained below.

I.      **BACKGROUND**

In 2016, California voted to legalize marijuana use by adults 21 and older, among other changes.  *See People v. Raybon*, 11 Cal. 5th 1056, 1060 (2021); Control, Regulate and Tax Adult Use of Marijuana Act, 2016 Cal. Legis. Serv. Prop. 64 (West).  The next year, the Sacramento City Council tasked the City's staff with creating a program "to address the negative impacts of disproportionate enforcement of cannabis-related regulation."  Sacramento City Council Res. No.

1

2018-0323 (Aug. 9, 2018), Req. J. Not. Ex. 1 at 1, ECF No. 13-2.[1]  Staff developed the "Cannabis Opportunity Reinvestment and Equity" or "CORE" program.  *Id.* at 2.  The CORE program describes its purpose as reducing "barriers of entry and participation" in the cannabis industry to those who "have been negatively impacted by the disproportionate law enforcement of cannabis related crimes."  *Id.* at 19.  It offers "cannabis business development resources, services, and contracting and shareholder opportunities."  *Id.*  To be eligible to participate in the CORE program, an applicant must fit within one of five defined "classifications."  *See id.* at 23.  Only the first two classifications are relevant to this order:

> **Classification 1.** A current or former resident of the City of Sacramento who previously resided or currently resides in a low-income household and was either: a) arrested or convicted for a cannabis related crime in Sacramento between the years 1980 and 2011; or is b) an immediate family member of an individual described in subsection a of Classification 1 or Classification 2.

> **Classification 2.** A current or former resident of the City of Sacramento who has lived in a low-income household for at least five (5) years, between the years 1980 and 2011 in [nine listed zip codes]:

*Id.*  Most importantly for this case, both require applicants to be current or former Sacramento residents.

After the City Council adopted the CORE program, it decided to issue "storefront cannabis dispensary" permits to applicants in the first two CORE classifications.  Sacramento City Council Res. No. 2020-0338 (Oct. 13, 2020), Req. J. Not. Ex. 2 at 1, ECF No. 13-2.  That is, to be eligible, a person must fit the requirements of classification 1 or 2, so an applicant must be a current or former Sacramento resident.  Permits would be awarded in a competitive process, structured around a "request for qualifications" or "RFQ" process, that weighed applicants' qualifications and their likely ability "to successfully apply for and operate a storefront dispensary."  *Id.*  The City decided to "offer the opportunity to apply" for a permit to the ten

---

[1] The court grants the City's unopposed request for judicial notice of the resolutions and other public records cited in this order.  *See* Fed. R. Evid. 201(b); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (taking judicial notice of similar records at pleadings stage).

1  applicants who score highest in this process.  Application Form at 2, Req. J. Not. Ex. 3, ECF No.

2  13-2.

3       Peridot is a California company.  First Am. Compl. ¶ 1, ECF No. 12.  Gay is its majority

4  shareholder.  *Id.* ¶ 2.  They applied for a dispensary license and asked to participate in the

5  process, but the City rejected their application because they did not meet the requirements of

6  CORE classifications 1 or 2.  *Id.* ¶¶ 21–22.  Gay has never lived in Sacramento.  *Id.* ¶ 17.  He

7  otherwise meets the requirement of CORE classifications 1 and 2.  *Id.* ¶¶ 18–19.

8       The City announced its top ten applicants in April 2021.  *Id.* ¶ 22.  Peridot and Gay allege

9  on information and belief that all ten "are affiliated with individuals who have resided in

10  Sacramento."  *Id.*  They filed this lawsuit several months after the results were announced.  They

11  claim the City's program is unconstitutional because it discriminates against out-of-state

12  applicants in violation of the "Dormant Commerce Clause," and they seek declaratory judgment

13  to the same effect.  *Id.* ¶¶ 23–31.  In addition to the declaration, their complaint requests damages,

14  an injunction, costs, fees, and whatever other relief the court deems appropriate.  *Id.* at 10.

15       The City moves to dismiss.  *See generally* Mot., ECF No. 13; Mem., ECF No. 13-1.  It

16  argues the plaintiffs lack standing, *see* Mem. at 5–6, defends its application process as

17  constitutional, *see id.* at 6–9, and argues the complaint is too vague to make out a viable claim,

18  *see id.* at 9.  The plaintiffs oppose that motion, *see generally* Opp'n, ECF No. 15, and the City has

19  replied, *see generally* Reply, ECF No. 17.  Before the scheduled hearing date, the court ordered

20  the parties to submit supplemental briefs addressing whether this court should abstain from

21  adjudicating this action, *see* Order (May 17, 2022), ECF No. 19, and the parties have filed those

22  briefs, *see generally* Defs.' Suppl Br., ECF No. 20; Pls.' Suppl. Br., ECF No. 21.  The court heard

23  oral argument at a combined motion hearing and status conference on June 17, 2022.  Mins., ECF

24  No. 25.  Christian Kernkamp appeared for the plaintiffs, and Matthew Day appeared for the City.

## II.   JURISDICTION

26       The City argues first that the plaintiffs lack standing.  Article III of the U.S. Constitution

27  limits federal jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2.  The doctrine

28  of standing is rooted in that limitation.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

1    Standing has three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "The

2    plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged

3    conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision,"

4    *Spokeo*, 578 U.S. at 338. "The party invoking federal jurisdiction bears the burden of establishing

5    these elements." *Lujan*, 504 U.S. at 561. It must do so "for each claim" and "'each form of relief

6    sought.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quoting *Friends of the*

7    *Earth, Inc. v. Laidlaw Envt'l Servs.* (*TOC*)*, Inc.*, 528 U.S. 167, 185 (2000)). When, as in this

8    case, the standing question arises at the pleading stage, the plaintiff "must 'clearly . . . allege facts

9    demonstrating' each element." *Spokeo*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 480,

10   518 (1975)). An organization's standing is evaluated using "the same inquiry." *E. Bay Sanctuary*

11   *Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) (quoting *Havens Realty Corp. v. Coleman*,

12   455 U.S. 363, 378 (1982)).

13       The court begins with the plaintiffs' claims for damages. First, Peridot and Gay have each

14   suffered the necessary "concrete" and "particularized" injury. *Lujan*, 504 U.S. at 560. The City

15   denied their permit application. It did not allow them to participate in its competitive process.

16   Second, there is no question it was the City's decision to exclude them from this process. The

17   third element also is satisfied: damages could compensate them for the potential sales the City has

18   barred them from pursuing.

19       The City argues the plaintiffs do not have standing to pursue damages for two reasons.

20   First, it points out that the "winners" of its competitive process are not guaranteed a permit. *See*

21   Mem. at 6. The City has offered them only the opportunity to apply and compete for a permit.

22   Application Form at 2, Req. J. Not. Ex. 3. Even if plaintiffs had been allowed to participate in the

23   City's process, it might have denied their application in favor of a more qualified proposal. Mem.

24   at 6. Second, the City argues that any estimation of potential profits would amount to

25   speculation. *See* Mem. at 6.

26       These arguments suffer from a common flaw. Winning the 100 meter dash is no

27   guarantee of a podium finish in a decathlon, but an athlete who is wrongly barred from starting

28   that race has certainly been hampered in her hunt for the overall gold. Peridot and Gay similarly

4

fell out of the race right from the start.  Here, there is a concrete injury in the necessary sense.
*See, e.g.*, *NPG, LLC v. City of Portland, Me.*, No. 20-00208-NT, 2020 WL 4741913, at *6 (D. Me. Aug. 14, 2020) ("Although the Plaintiffs have not been denied a license, their alleged injury is not the denial itself but the disadvantage they face in obtaining a license due to the City's [policy].").  The amount of plaintiffs' alleged damages is uncertain, but that uncertainty does not deprive them of standing.  *See, e.g.*, *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1172 (9th Cir. 2002).  A claim for even nominal damages would suffice for jurisdictional purposes.  *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021).

In addition to damages, the plaintiffs request "an injunction prohibiting Defendants from processing any applications for storefront cannabis dispensary licenses from the requests for qualifications for cannabis storefront dispensaries held from January 20, 2021 to February 19, 2021," i.e., the period during which their application was denied.  First Am. Compl. at 10.  Similarly, they request a judicial declaration that the challenged resolutions are unconstitutional, that "the residency preferences may not be enforced," and that the City "may not process any applications for storefront cannabis dispensary licenses from the requests for qualifications for cannabis storefront dispensaries" over the same period.  *Id.*  These equitable forms of relief would redress their alleged injury by preventing the City from giving any preference to current or former local residents.  Plaintiffs have standing to pursue their requests for injunctive and declaratory relief.

The court denies the motion to dismiss for lack of standing.

## III.   ABSTENTION

Although federal courts have a "virtually unflagging obligation" to exercise their jurisdiction, *Colo. River Water Cons. Dist. v. United States*, 424 U.S. 800, 817 (1976), this obligation is not "absolute," *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996).  The Supreme Court has recognized a range of circumstances in which a district court "may decline to exercise or postpone the exercise of its jurisdiction."  *Allegheny Cnty. v. Frank Mashuda Co.*, 360 U.S. 185, 188 (1959).  It has emphasized, however, that abstention "is an extraordinary and

5

1   narrow exception" limited to cases in which an "order to the parties to repair to the state court

2   would clearly serve an important countervailing interest." *Id.* at 188–89.

3          This case does not fit neatly within any single abstention doctrine the Supreme Court has

4   recognized.  The Court has held, however, that these doctrines are not "rigid pigeonholes into

5   which federal courts must try to fit cases." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12 n.9

6   (1987).  Its abstention decisions overlap in a "complex" web and are all "designed to soften the

7   tensions inherent in a system that contemplates parallel judicial processes" in state and federal

8   courts.  *Id.*  Abstention doctrines "allow federal courts to give appropriate and necessary

9   recognition to the role and authority of the States.  The duty to take these considerations into

10  account must inform the exercise of federal jurisdiction." *Quackenbush*, 517 U.S. at 733

11  (Kennedy, J., concurring).

12         When cases present difficult federal constitutional questions with significant implications

13  for sensitive state policies, federal courts have often declined to exercise their jurisdiction.  In

14  *Burford v. Sun Oil Co.*, for example, the Supreme Court approved the district court's decision to

15  step back because parallel federal lawsuits threatened to frustrate Texas's efforts to provide a

16  uniform, specialized, and efficient system to resolve oil drilling disputes.  *See* 319 U.S. 315, 318–

17  20, 327–28, 331–32 (1943).  In later decisions, the Supreme Court has described its holding in

18  *Burford* as permitting a district court to abstain when federal litigation would disrupt state efforts

19  to "establish a coherent policy with respect to a matter of substantial public concern." *Colo.*

20  *River*, 424 U.S. at 814; *see also, e.g.*, *Quackenbush*, 517 U.S. at 726–27 ("*Burford* allows a

21  federal court to dismiss a case only if it presents 'difficult questions of state law bearing on policy

22  problems of substantial public import whose importance transcends the result in the case then at

23  bar,' or if its adjudication in a federal forum 'would be disruptive of state efforts to establish a

24  coherent policy with respect to a matter of substantial public concern.'" (quoting *New Orleans*

25  *Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989))).

26         Similarly, in *Louisiana Light & Power v. City of Thibodaux*, 517 U.S. 706 (1959), the

27  Supreme Court held that "federal courts have the power to refrain from hearing . . . cases raising

28  issues 'intimately involved with the States' sovereign prerogative, the proper adjudication of

1    which might be impaired by unsettled questions of state law." *Quackenbush*, 517 U.S. at 716–17

2    (quoting *Thibodaux*, 360 U.S. at 28)).  Whether or not this doctrine is separate from what the

3    Supreme Court described in *Burford*, its motivation is the same: federal courts should abstain

4    from adjudicating certain cases if the state court is in a better position to protect the state's

5    interests.  *See Hawthorne Sav. F.S.B. v. Reliance Ins. Co. of Ill.*, 421 F.3d 835, 846 n.9 (9th Cir.

6    2005), *amended on other grounds*, 433 F.3d 1089 (9th Cir. 2006).

7            The abstention doctrine of *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941),

8    rests on similar concerns.  The Supreme Court held in *Pullman* that federal district courts may

9    abstain from adjudicating a federal constitutional issue that "might be mooted or presented in a

10   different posture by a state court determination of pertinent state law."  *Allegheny Cnty.*, 360 U.S.

11   at 189.  Under the contemporary expression of this doctrine, a district court may abstain if (1) the

12   case concerns "a sensitive area of social policy upon which the federal courts ought not enter

13   unless no alternative to its adjudication is open," (2) "a definite ruling on the state issue would

14   terminate the controversy," thus avoiding constitutional litigation, and (3) "the proper resolution

15   of the possible determinative issue of state law is uncertain."  *Courthouse News Serv. v. Planet*,

16   750 F.3d 776, 783–84 (9th Cir. 2014) (quoting *Porter v. Jones*, 319 F.3d 483, 492 (9th Cir.

17   2003)).  Uncertainty about state law is a keystone of this test: the federal court can abstain only if

18   it "cannot predict with any confidence how the state's highest court would decide an issue of state

19   law."  *Slidewaters LLC v. Washington State Dep't of Lab. & Indus.*, 4 F.4th 747, 761 (9th Cir.

20   2021) (quoting *Courtney v. Goltz*, 736 F.3d 1152, 1163 (9th Cir. 2013)), *cert. denied*, 142 S. Ct.

21   779 (2022).

22           A number of other abstention doctrines rest on similar concerns about conflicts between

23   parallel federal and state proceedings.  *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995)

24   (holding district courts may stay action for declaratory relief if another suit involving same parties

25   and same state law issues is pending in state court); *Colo. River*, 424 U.S. at 817–20 (permitting

26   abstention from federal actions that duplicate pending state case in some circumstances); *Younger*

27   *v. Harris*, 401 U.S. 27, 43–44 (1971) (holding federal courts may abstain to avoid interfering with

28   pending state criminal proceeding).  "In addition, a federal court may stay its proceedings based

                                                    7

1   on comity even when none of the abstention doctrines requires that it do so." *Noel v. Hall*,

2   341 F.3d 1148, 1160 (9th Cir. 2003) (citing *Deakins v. Monaghan*, 484 U.S. 193, 202–03 (1988)).

3         In this case, federal and state policies collide at virtually every turn.  In the first instance,

4   California's interests loom large.  For more than a hundred years, "California has been a pioneer

5   in the regulation of marijuana." *Gonzales v. Raich*, 545 U.S. 1, 5 (2005).  It was one of the first

6   states to prohibit the possession and sale of marijuana in the early Twentieth Century.  *See id.*

7   (citing 1913 Cal. Stats. Ch. 342 § 8a).  Then it was one of the first states to permit marijuana use

8   for medical purposes.  *See* Compassionate Use Act of 1996, 1996 Cal. Legis. Serv. Prop. 215

9   (West).  Twenty years later, it was within the first group of states to permit marijuana for

10   nonmedical purposes as well.  *See* Control, Regulate and Tax Adult Use of Marijuana Act (Prop.

11   64), 2016 Cal. Legis. Serv. Prop. 64 (West).

12         California adopted its current marijuana policy by popular vote through a constitutional

13   ballot initiative in 2016.  *See* Cal. Const. Art. II § 8.  According to the official voter guide for this

14   initiative, commonly known as Proposition 64, voters made four basic changes to California law:

15   (1) it became legal under state law for adults to use marijuana for nonmedical purposes, (2) the

16   state adopted a regulatory system for nonmedical marijuana businesses, (3) the state began taxing

17   marijuana, and (4) criminal penalties for marijuana-related crimes changed.  *See* Voter

18   Information Guide, General Election at 92 (Nov. 8, 2016).[2]

19         Proposition 64 includes a detailed explanation of its purposes, such as protecting children

20   and the environment from the harms of a burgeoning illicit drug market, *see* Prop. 64 § 3(a), (g),

21   (h), (j), (n), (o), (y); balancing state and local interests and preserving the authority of local

22   governments to make their own policies and regulate land use, *see id.* § 3(d), (m); recognizing the

23   importance of public safety and private property rights and allowing employers to make their own

24   workplace policies for marijuana, *see id.* § 3(i), (p), (q), (r); alleviating "pressure" on the state's

25   courts, which were "clogged with cases of non-violent drug offenses," *id.* § 2(G); resentencing

26   defendants who would have received lesser punishment under the new regime, *id.* § 3(z);

---

[2] https://vig.cdn.sos.ca.gov/2016/general/en/pdf/complete-vig.pdf (last visited Oct. 13, 2022).

8

1   generating tax revenue, opening legal markets, and closing illegal markets, *id.* § 3(s), (t), (u), (v),

2   (x); and "[s]trengthen[ing] the state's existing medical marijuana system," *id.* § 3(k).

3         These wide-reaching purposes manifest themselves in a regulatory system Proposition 64

4   itself describes as "comprehensive." *Id.* § 3. The initiative added an entirely new division to the

5   California Business & Professions Code "to establish a comprehensive system to control and

6   regulate the cultivation, distribution, transport, storage, manufacturing, processing, and sale of

7   nonmedical marijuana and marijuana products for adults 21 years of age and over." Cal. Bus. &

8   Prof. Code § 26000(a) (2016). It also amended the state's Health and Safety Code, Labor Code,

9   Water Code, Revenue and Tax Code, and Food and Agricultural Code. *See, e.g.*, Cal. Health &

10  Safety Code § 11362.1 (2016) (permitting possession, processing, transportation, purchase, and

11  use of marijuana by adults); Cal. Lab. Code § 147.6(a) (2016) (directing Division of Occupational

12  Safety and Health to "evaluate whether there is a need to develop industry-specific regulations"

13  for newly established cannabis industry); Cal. Water Code § 13276(b) (2016) (allowing state and

14  regional water boards to "address discharges of waste resulting from medical marijuana

15  cultivation and commercial marijuana cultivation" under new division of Business and

16  Professions Code); Cal. Rev. & Tax Code §§ 34011–34012 (2016) (establishing marijuana excise

17  and cultivation taxes); Cal. Food & Ag. Code § 81010(b) (2016) (applying Food and Agricultural

18  Code to "possession, use, purchase, sale, production, manufacture, packaging, labeling,

19  transporting, storage, distribution, use, and transfer of industrial hemp").

20        As described above and in plaintiffs' complaint, Sacramento decided in the wake of

21  Proposition 64 to devote its own resources to the new cannabis industry as well. Its city council

22  has explored how it can help those who suffered disproportionately under the state's former

23  criminal prohibitions and how it can help residents enter the newly legalized industry.

24  Sacramento City Council Res. No. 2018-0323 (Aug. 9, 2018), Req. J. Not. Ex. 1 at 1, ECF

25  No. 13-2.

26        The United States' ambiguous marijuana enforcement policies stand in stark contrast with

27  California's deliberate and extensive regulatory effort. As then-judge Gorsuch wrote several

9

1    years ago, the federal government has been sending "mixed messages" for some time. *Feinberg*

2    *v. C.I.R.*, 808 F.3d 813, 814 (10th Cir. 2015).

3            In the 1960s, the President of the United States declared a "war on drugs." *Raich*,

4    545 U.S. at 10. Ten years later, Congress passed the Controlled Substances Act, which

5    established "a comprehensive regime to combat the international and interstate traffic in illicit

6    drugs." *Id.* at 12. The Controlled Substances Act is "a closed regulatory system making it

7    unlawful to manufacture, distribute, dispense, or possess any controlled substance" except as that

8    law authorizes. *Id.* at 13 (citing 21 U.S.C. §§ 841(a)(1), 844(a)). The Act groups drugs "based

9    on their accepted medical uses, the potential for abuse, and their psychological and physical

10   effects on the body." *Id.* at 13–14 (citing 21 U.S.C. §§ 811–12). The strictest and heaviest

11   regulations apply to drugs in "Schedule I," which Congress described as those substances that

12   lack any accepted medical use, high abuse potential, and danger. *See* 21 U.S.C. § 812(b)(1).

13   Congress included marijuana in this group. *See id.* § 812(c) Sched. I. "By classifying marijuana

14   as a Schedule I drug, as opposed to listing it on a lesser schedule, the manufacture, distribution, or

15   possession of marijuana became a criminal offense, with the sole exception being use of the drug

16   as part of a Food and Drug Administration preapproved research study." *Raich*, 545 U.S. at 14

17   (citing 21 U.S.C. §§ 823(f), 841(a)(1), 844(a)). Virtually any marijuana transaction is unlawful

18   under federal law: from possession to distribution to sales; even renting a room to someone "for

19   the purpose of" using marijuana is unlawful if done knowingly. *See* 21 U.S.C. § 856(a). The

20   government can also forfeit assets and property obtained in violation of the Controlled Substances

21   Act's marijuana prohibitions. *See* 21 U.S.C. § 853(a)–(b).

22           Despite these stringent and comprehensive prohibitions, states have authorized marijuana

23   use for medical purposes for more than twenty years. *See Raich*, 545 U.S. at 5 n.1 (citing laws

24   and initiatives in Alaska, Arizona, Colorado, Hawaii, Maine, Montana, Nevada, Oregon,

25   Vermont, and Washington). And "[s]ince December 16, 2014, congressional appropriations

26   riders have prohibited the use of any DOJ funds that prevent states with medical marijuana

27   programs (including California) from implementing their state medical marijuana laws." *United*

10

1   *States v. Kleinman*, 880 F.3d 1020, 1027 (9th Cir. 2017); *see also* Cong. Res. Serv., "Funding

2   Limits on Federal Prosecutions of State-Legal Medical Marijuana" (Feb. 4, 2022).[3]

3       "[O]fficials at the Department of Justice" have also "instructed field prosecutors that they

4   should generally decline to enforce" federal marijuana prohibitions in states like California,

5   which permit marijuana distribution. *Feinberg*, 808 F.3d at 814.  In 2009, the Deputy Attorney

6   General issued a memorandum acknowledging "that some States have enacted laws authorizing

7   the medical use of marijuana." *United States v. Canori*, 737 F.3d 181, 183 (2d Cir. 2013); *see*

8   *also United States v. Pickard*, 100 F. Supp. 3d 981, 1010–11 (E.D. Cal. 2015); David W. Ogden,

9   Deputy Att'y Gen., "Memorandum for Selected United States Attorneys" (Oct. 19, 2009).[4]  He

10  advised local prosecutors not to spend time and money on cases against "individuals whose

11  actions are in clear and unambiguous compliance with existing state laws providing for the

12  medical use of marijuana." *Canori*, 737 F.3d at 183.  The Deputy Attorney General "reaffirmed"

13  and updated this guidance in 2011 and 2013.  *Id.* at 184 & n.5; *Pickard*, 100 F. Supp. 3d at 1010;

14  James A. Cole, Deputy Att'y Gen. of the U.S., "Memorandum for All United States Attorneys"

15  (Aug. 29, 2013).[5]  His memos describe several "enforcement priorities," such as "preventing

16  revenue from the sales of marijuana from going to criminal enterprises, gangs, and cartels," and

17  "preventing state-authorized marijuana activity from being used as a cover or pretext for the

18  trafficking of other illegal drugs or other illegal activity." *Pickard*, 100 F. Supp. 3d at 1010–11

19  (alterations and quotation marks omitted).

20      The prior Administration issued conflicting statements about its cannabis enforcement

21  priorities.  *See Original Invs., LLC v. State*, 542 F. Supp. 3d 1230, 1236–37 (W.D. Okla. 2021)

22  (citing Memorandum for all United States Attorneys: Marijuana Enforcement, Office of the

23  Attorney General (Jan. 4, 2018) and Review of the FY2020 Budget Request for DOJ, 116th

24  Cong. (Apr. 10, 2019) (testimony of William Barr, Att'y Gen. of the United States).

---

[3] https://crsreports.congress.gov/product/pdf/LSB/LSB10694/2 (last visited Oct. 13, 2022).

[4] https://www.justice.gov/archives/opa/blog/memorandum-selected-united-state-attorneys-investigations-and-prosecutions-states (last visited Oct. 13, 2022).

[5] https://www.justice.gov/iso/opa/resources/3052013829132756857467.pdf

1      The current President stated during his campaign for office that he would "decriminalize

2   the use of cannabis," Biden Harris, "Lift Every Voice: The Biden Plan for Black America."[6]  He

3   recently exercised his authority to "grant a full, complete, and unconditional pardon to . . . all

4   current United States citizens and lawful permanent residents who committed the offense of

5   simple possession of marijuana in violation of the Controlled Substances Act."  Pres. Joseph R.

6   Biden, "A Proclamation on Granting Pardon for the Offense of  Simple Possession of Marijuana"

7   (Oct. 6, 2022).[7]  He announced he would ask the Secretary of Health and Human Services and the

8   Attorney General "to initiate the administrative process to review expeditiously how marijuana is

9   scheduled under federal law."  Pres. Joseph R. Biden, "Statement from President Biden on

10   Marijuana Reform (Oct. 6, 2022).[8]  He also reiterated his position from the campaign that "no one

11   should be in jail just for using or possessing marijuana."  *Id.*

12      Memoranda and policies are, of course, not laws.  They neither repeal the Controlled

13   Substances Act nor remove marijuana from Schedule I.  They offer "guidance" on how

14   prosecutors should exercise their authority to enforce federal law.  *See Canori*, 737 F.3d at 184.

15   As a result, those in the business of "cultivating, selling or distributing marijuana, and those who

16   facilitate such activities, are in violation of the Controlled Substances Act, regardless of state

17   law," even today.  *Id.* (quotation marks omitted).  Executive Branch enforcement policies can and

18   do change, even if the law remains the same.  *Cf. Dept' of Homeland Sec. v. Regents of the Univ.

19   of Cal.*, 140 S. Ct. 1891, 1901–03 (2020) (describing recent history of Security of Homeland

20   Security's immigration enforcement priorities).  But Congress has not condemned the Executive

21   Branch's enforcement strategy.  If anything, it has approved of it by forbidding expenditures on

22   certain enforcement actions, as noted above.  *See Kleinman*, 880 F.3d at 1027.  In sum, Congress

23   and the Executive Branch have expressed little interest in strictly enforcing the comprehensive

24   and thorough federal marijuana ban; they have expressed disinterest.

---

[6] https://joebiden.com/blackamerica/ (last visited Oct. 13, 2022).

[7] https://www.whitehouse.gov/briefing-room/presidential-actions/2022/10/06/granting-pardon-for-the-offense-of-simple-possession-of-marijuana/ (last visited Oct. 13, 2022).

[8] https://www.whitehouse.gov/briefing-room/statements-releases/2022/10/06/statement-from-president-biden-on-marijuana-reform/ (last visited Oct. 13, 2022).

1    The ambiguity of federal policy is only one reason to doubt the salience of the federal

2    interests at stake in this case.  The nature of Peridot and Gay's claim also rests on a shaky

3    constitutional foundation.  Plaintiffs rely on the Dormant Commerce Clause, which "prevents the

4    States from adopting protectionist measures and thus preserves a national market for goods and

5    services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019)

6    (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)).  Put simply, the

7    plaintiffs ask this court to open Sacramento's borders to out-of-state marijuana sellers.  But in

8    passing the Controlled Substances Act, Congress exercised its constitutional authority to pass

9    laws "necessary and proper" to "regulate Commerce . . . among the several States."  *Raich*,

10   545 U.S. at 22 (quoting U.S. Const. art. I, § 8).  It clearly and thoroughly prohibited almost every

11   aspect of the market for marijuana.  Congress has effectively said there should be no interstate

12   commerce in marijuana.

13   Moreover, it is difficult to see what constitutional right a person could have to participate

14   freely in illegal interstate marijuana markets.  Some courts have found a constitutional right, but

15   not without difficulty.  In Maine, for example, district courts have acknowledged that Congress

16   has criminalized interstate commerce in marijuana, but they have not seen this criminal

17   prohibition as a license for states to target out-of-state marijuana distribution.  *See Ne. Patients*

18   *Grp. v. Me. Dept's of Admin. & Financial Servs.*, 554 F. Supp. 3d 177, 184 & n.9 (D. Me. 2021);

19   *see also, e.g.*, *NPG, LLC v. City of Portland, Me.*, No. 20-00208, 2020 WL 4741913, at *10 (D.

20   Me. Aug. 14, 2020).  In Illinois, a district court acknowledged "the animating purpose of the

21   Commerce Clause—fostering free trade among the States—does not apply with equal force" to

22   marijuana markets.  *Finch v. Treto*, ___ F. Supp. 3d ___, No. 22-1508, 2022 WL 2073572, at *14

23   (N.D. Ill. June 9, 2022).  The court was persuaded, however, that the implicit constitutional

24   prohibition against discriminatory state laws did not "fall out of the picture."  *Id.*

25   These decisions rest on an exception to the ordinary Dormant Commerce Clause

26   prohibition: federal courts excuse state laws that discriminate against interstate commerce if

27   Congress has "expressly stated its intent and policy" to allow those laws.  *New England Power*

28   *Co. v. New Hampshire*, 455 U.S. 331, 343 (1982) (quoting *Prudential Ins. Co. v. Benjamin*, 328

13

U.S. 408, 427 (1946)).  This exception seems an odd fit for a marijuana case.  Congress has provided by statute for punishing virtually every aspect of interstate marijuana commerce criminally, while also limiting use of federal resources for some prosecutions.  Having passed such a comprehensive prohibition, it would be surprising if Congress had then expressly allowed states to protect their local marijuana enterprises.  *Cf. Raich*, 545 U.S. at 33 ("Given the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere and concerns about diversion into illicit channels, we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the [Controlled Substances Act]." (citations and footnotes omitted)).  Suffice it so say the constitutional question is difficult and "unsettled in federal courts across the country."  *See Finch*, 2022 WL 2073572, at *15.

Taking a step back, then, if this case were to proceed, the court would be forced to weigh in on a difficult constitutional dispute in which California's interests are clear and substantial: it has passed a wide-reaching and complex program designed to foster, regulate, and tax a new cannabis industry.  The federal interests, by contrast, are murky: Congress has strictly and unambiguously prohibited all commerce in marijuana, but in recent years, the political branches have expressed no interest in enforcing that prohibition.  The President has also called for a review of marijuana's classification on Schedule I.  The constitutional right in question—the alleged right to a free-flowing interstate marijuana market—may also be a chimera; Congress punished those who participate in that market with criminal liability.

These circumstances make a strong case for abstention.  But there is yet another reason for caution.  Several federal district courts have refused to "award profits from a business that grows, processes, and sells marijuana" in cases involving state law contract and similar claims.  *Sensoria, LLC v. Kaweske*, No. 20-942, 2021 WL 2823080, at *8 (D. Colo. July 7, 2021).  Their reasoning is straightforward: "A federal court may not compel performance of an illegal contract and may not grant relief that would compel a party to violate federal law."  *Sensoria, LLC v. Kaweske*, No. 20-00942, 2021 WL 103020, at *6 (D. Colo. Jan. 12, 2021); *see also Bassidji v. Goe*, 413 F.3d

14

928, 936 (9th Cir. 2005) (holding in case unrelated to marijuana that "courts will not order a party to a contract to perform an act that is in direct violation of a positive law directive, even if that party has agreed, for consideration, to perform that act").

Longstanding equitable principles similarly constrain federal district courts such as this one.  "A plaintiff asking a court for equitable relief 'must come with clean hands,'" *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 959 (9th Cir. 2015) (quoting *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944)), meaning a court may decline to consider a claim for equitable relief when a plaintiff has not acted "fairly," *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).  This doctrine "is rooted in the historical concept of a court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith." *Id.* at 814.  As a result, "in an ordinary case," a federal court should not "lend its judicial power to a plaintiff who seeks to invoke that power for the purposes of consummating a transaction in clear violation of law." *Yellow Cab*, 321 U.S. at 387.  "[E]quity does not demand," however, "that its suitors shall have led blameless lives," *Loughran v. Loughran*, 292 U.S. 216, 229 (1934).  Nor must courts "permit a defendant wrongdoer to retain the profits of his wrongdoing merely because the plaintiff himself is possibly guilty of transgressing the law." *Northbay Wellness Grp.*, 789 F.3d at 960 (quoting *Yellow Cab*, 321 U.S. at 387). "[T]he clean hands doctrine should not be strictly enforced when to do so would frustrate a substantial public interest." *EEOC v. Recruit U.S.A., Inc.*, 939 F.2d 746, 753 (9th Cir. 1991).  In other words, two wrongs do not make a right.

Sometimes these rules are easy to apply without disrupting a state's marijuana regulations. *See, e.g.*, *Northbay Wellness Grp.*, 789 F.3d at 958–61 (declining to exercise equitable powers to benefit attorney who stole from marijuana distributor client) *Greenwood v. Green Leaf Lab LLC*, No. 17-00415, 2017 WL 3391671, at *3 (D. Or. July 13, 2017) (awarding unpaid wages to employee of marijuana distributor), *report and recommendation adopted*, 2017 WL 3391647 (D. Or. Aug. 7, 2017).  This case is more like those in which federal courts have refused relief.  Last year, an Oklahoma district court dismissed a case very similar to this one because it was concerned that resolving the case would require it to compel illegal actions.  *See generally*

15

1   *Original Invs.*, 542 F. Supp. 3d 1230–34.  At least two judges of the Tenth Circuit reached

2   essentially the same conclusion in *Fourth Corner Credit Union v. Federal Reserve Bank of*

3   *Kansas City*, albeit in a fractured set of opinions.  *See* 861 F.3d 1052, 1055 (10th Cir. 2017)

4   (Moritz, J.); *id.* at 1066 (Bacharach, J.); *see also Sensoria, LLC v. Kaweske*, 581 F. Supp. 3d

5   1243, 1259–60 (D. Colo. 2022) (interpreting *Fourth Corner* as recognizing that marijuana

6   distributors cannot obtain equitable relief due to the Controlled Substances Act); *Original*

7   *Investments*, 542 F. Supp. 3d at 1235–36 (same).

8       To be sure, a defense along these lines has its faults.  As the district court wrote in *Finch*,

9   a state or local government that fosters a local marijuana market has sullied its hands in the same

10  basic sense as has a marijuana distributor.  2022 WL 2073572, at *14.  But the Supreme Court's

11  decision in *United States v. Oakland Cannabis Buyers' Co-Op*, 532 U.S. 483 (2001), casts doubt

12  on that conclusion.  The Court held that federal district courts cannot employ their equitable

13  powers if doing so would effectively revisit decisions Congress had already made when it passed

14  the Controlled Substances Act.  *See id.* at 497–98.  "[A] court sitting in equity cannot 'ignore the

15  judgment of Congress, deliberately expressed in legislation.'"  *Id.* at 497 (quoting *Virginian R.*

16  *Co. v. Railway Employees*, 300 U.S. 515, 551 (1937)).  And Congress had already decided

17  marijuana "has 'no currently accepted medical use' at all."  *Id.* at 491 (quoting 21 U.S.C. § 812).

18      Concerns like these have led federal district courts to express unease with disputes about

19  state cannabis regulations.  *See, e.g.*, *MediGrow, LLC v. Natalie M. LaPrade Cannabis*

20  *Commission*, 487 F. Supp. 3d 364, 368–70, 376 (D. Md. 2020) (declining to exercise jurisdiction

21  over state law claims about state marijuana licensing system); *Left Coast Ventures, Inc. v. Bill's*

22  *Nursery Inc.*, No. 19-1297, 2019 WL 6683518, *2 (W.D. Wash. Dec. 6, 2019) (abstaining from

23  adjudicating marijuana licensing dispute under *Burford*); *Brinkmeyer v. Washington State Liquor*

24  *and Cannabis Board*, No. 20-5661, 2020 WL 5893807 (W.D. Wash. Oct. 5, 2020) (abstaining

25  under *Pullman* from adjudicating federal constitutional challenge to state-law cannabis licensing

26  scheme and severing and remanding state claims).  This court recently joined this group in a

27  dispute about state law.  *See Gopal v. Luther*, No. 21-00735, 2022 WL 504983, at *4 (E.D. Cal.

28  Feb. 18, 2022) ("State courts have a greater interest in the interpretation of state laws that create

1    regulatory channels for cannabis cultivation, licensing, sales, and distribution, especially when

2    those laws conflict with the [Controlled Substance Act].").

3        In this case, if this court proceeded to decide whether an unclean-hands or illegal conduct

4    defense is viable, it would risk upending significant portions of Proposition 64.  If the defense

5    were ultimately successful, participants in the state's new cannabis industry could likely assert it

6    in any dispute about their businesses and contracts.  The costs and risks of participating in the

7    new industry would rise.  And if litigants thought their chances of prevailing on such a defense

8    were greater in federal court, they might shop for a federal forum.  California courts have not

9    expressed similar concerns about adjudicating cannabis disputes.  *See, e.g.*, *City of Riverside v.*

10   *Inland Empire Patients Health & Wellness, Inc.*, 56 Cal. 4th 729, 738–40, 763 n.14 (2013)

11   (acknowledging federal prohibitions but declining to consider conflicts between federal and state

12   laws); *Granny Purps, Inc. v. County of Santa Cruz*, 53 Cal. App. 5th 1, 6–10 (2020) (reversing

13   order sustaining demurrer to causes of action for return of seized marijuana plants); *City of Palm*

14   *Springs v. Luna Crest Inc.*, 245 Cal. App. 4th 879, 884–85 (2016) ("[W]e find no merit in the

15   assertion that City's permit requirement for medical marijuana dispensaries is preempted by

16   federal law."); *Qualified Patients Assn. v. City of Anaheim*, 187 Cal. App. 4th 734, 759 (2010)

17   ("The federal [Controlled Substances Act] does not direct local governments to exercise their

18   regulatory, licensing, zoning, or other power in any particular way."); *City of Garden Grove v.*

19   *Superior Court*, 157 Cal. App. 4th 355, 391 (2007) ("Mindful as we are of the general supremacy

20   of federal law, we are unable to discern any justification for the City or its police department to

21   disregard the trial court's order to return [seized] marijuana.  The order is fully consistent with

22   state law respecting the possession of medical marijuana, and for all the reasons discussed, we do

23   not believe the federal drug laws supersede or preempt [the claimant's] right to the return of his

24   property.").

25       This court cannot predict what the California Supreme Court would decide if it were

26   asked to recognize the rights of a business that Congress has criminalized but California has

27   fostered, regulated and taxed.  On the one hand, California courts, like federal courts, have

28   refused to compel actions that would be illegal under federal law.  *See, e.g.*, *Kashani v. Tsann*

17

1    *Kuen China Enter. Co.*, 118 Cal. App. 4th 531, 547–48 (2004).  But on the other hand, even

2    "illegal contracts" can be enforced in some "compelling cases."  *Asdourian v. Araj*, 38 Cal. 3d

3    276, 292 (1985) (citing *Southfield v. Barrett*, 13 Cal. App. 3d 290, 294 (1970)).  This case and

4    others like it may very well fit that description, given the federal government's recent

5    ambivalence toward marijuana enforcement.

6            Plaintiffs in this case seem unconcerned about the likely success of an illegal conduct

7    defense.  They filed their action in this court, they have not pursued any state-law administrative

8    or judicial remedies, and they have argued this court should not abstain.  The implications of their

9    decision, however, go beyond this case.  Another plaintiff may not assess its chances against an

10   unclean-hands or illegal-conduct defense as optimistically as Peridot and Gay appear to.  The

11   court also hesitates to wade into a murky, unresolved conflict between state and federal drug law

12   at one particular plaintiff's urging.  California courts can and do adjudicate disputes about the

13   dormant Commerce Clause and have vindicated foreign defendants' rights.  *See generally, e.g.*,

14   *Pac. Merch. Shipping Ass'n v. Voss*, 12 Cal. 4th 503 (1995) (invalidating facially discriminatory

15   state law); *Arrow Highway Steel, Inc. v. Dubin*, 56 Cal. App. 5th 876 (2020) (same), *review

16   denied* (Feb. 10, 2021), *cert. denied*, 142 S. Ct. 1106 (2022).

17           The plaintiffs correctly note that several other federal district courts have not been so

18   concerned about the consequences of exercising their jurisdiction.  *See generally, e.g.*, *Ne.

19   Patients Grp.*, 554 F. Supp. 3d 177 (granting injunction in similar dormant Commerce Clause

20   dispute); *Attitude Wellness, LLC v. Vill. of Pinckney*, No. 21-12021, 2022 WL 1050305 (E.D.

21   Mich. Apr. 7, 2022) (finding plaintiff was likely to succeed with similar claims but declining to

22   enjoin challenged law considering other relevant factors); *NPG*, 2020 WL 4741913 (granting

23   preliminary injunctive relief in similar Commerce Clause dispute).  As the plaintiffs argue, there

24   is little doubt those other courts had subject matter jurisdiction.  *See* Pls.' Suppl. Br. at 8.  But

25   they did not consider whether to abstain.

26           Federal courts have adjudicated disputes related to marijuana and cannabis more broadly

27   without concern about the conflicts between state law and the Controlled Substances Act.  This

28   court recently dismissed claims by a plaintiff who alleged a local government had deprived him

18

of due process by enforcing zoning ordinances against cannabis cultivation.  *See* Order &

Judgment, *Lull v. Placer County*, No. 17-2216 (E.D. Cal. Sept. 30, 2019), ECF Nos. 42–43.  And

in another case, this court preliminarily enjoined county ordinances despite the county's objection

that these ordinances are necessary to stop illegal marijuana cultivation.  *See generally Lo v. Cnty.*

*of Siskiyou*, 558 F. Supp. 3d 850 (E.D. Cal. 2021).  In these cases, however, the plaintiffs were

not attempting to recover the profits of marijuana distribution, as the plaintiffs are here.  Nor were

they seeking injunctive and declaratory relief that would permit them to violate the Controlled

Substances Act.  This critical distinction makes all the difference here.

## IV.   CONCLUSION

Abstention is the wisest course in these circumstances.  States like California are

experimenting with marijuana policies and programs.  Those experiments are within their

traditional police powers over the health, welfare, and safety of their citizens.  *See Brecht v.*

*Abrahamson*, 507 U.S. 619, 635 (1993); *Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977).  To date,

Congress has neither altered federal law to permit these experiments nor expressed its

disapproval.  The Executive Branch has given only limited guidance.  Disputes about California's

foray into marijuana regulation are thus better resolved in state courts.  That is especially true in

this case.  Although the right the plaintiffs are attempting to preserve is federal and constitutional,

the object of that right is an interstate market that Congress has criminalized.

In the terms of the Supreme Court's abstention jurisprudence, this case presents difficult

questions "bearing on policy problems of substantial public import whose importance transcends

the result in the case at bar." *Quackenbush*, 517 U.S. at 726–27 (quoting *New Orleans Pub.*

*Serv., Inc.*, 491 U.S. at 361).  The mere availability of a federal forum risks disrupting

California's efforts to "establish a coherent policy with respect to a matter of substantial public

concern." *Colo. River*, 424 U.S. at 814–16.  And the constitutional question, how to apply the

Dormant Commerce Clause, is difficult.  It is better to allow state courts to answer that question,

as they are well-equipped to do.  *Cf. Burford*, 319 U.S. at 334 ("Under such circumstances, a

sound respect for the independence of state action requires the federal equity court to stay its

19

1    hand."); *Noel*, 341 F.3d at 1160 ("[A] federal court may stay its proceedings based on comity

2    even when none of the abstention doctrines requires that it do so.").

3          The court **abstains from exercising its jurisdiction over this case**.  This action is **stayed**

4    to permit the plaintiffs to seek relief in a California court or administrative venue of competent

5    jurisdiction or until such time as this court may award relief consistent with federal law.  The

6    parties **shall file a joint status report** on any related litigation within 120 days and every 120

7    days thereafter until this court orders otherwise.  All other dates and deadlines, including those

8    related to the pending motion for a preliminary injunction, are **vacated**.

9          IT IS SO ORDERED.

10    DATED:  October 17, 2022.

_____
CHIEF UNITED STATES DISTRICT JUDGE