1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9                     FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   Peridot Tree, Inc. and Kenneth Gay,              No. 2:22-cv-00289-KJM-SCR

12                    Plaintiffs,                     ORDER

13          v.

14   City of Sacramento and Davina Smith,

15                    Defendants.

16

17          The federal government's policy on marijuana use and distribution was once clear and

18   "comprehensive." *Gonzales v. Raich*, 545 U.S. 1, 10 (2005).  Today, however, as one Justice put

19   it a few years ago, the federal policy has become "a half-in, half-out regime that simultaneously

20   tolerates and forbids local use of marijuana." *Standing Akimbo, LLC v. United States*, 141 S. Ct.

21   2236–37 (2021) (Statement of Thomas, J., respecting the denial of certiorari).  This inherently

22   "contradictory" policy sometimes "conceals traps for the unwary."  *Id.*

23          In this case, for example, a prospective marijuana dispensary and its majority shareholder

24   allege the City of Sacramento, California has discriminated against them in violation of the

25   "dormant" aspect of the Constitution's Commerce Clause.  Ordinarily, the Commerce Clause

26   implicitly preserves free and open national markets from state and local protectionism.  *See Tenn.*

27   *Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019).  As explained in this order,

28   however, the plaintiffs cannot assert a constitutional right to participate in a national marijuana

1

1  market because Congress attempted to eliminate that market by passing the federal Controlled

2  Substances Act.  Even if the result is counter-intuitive, in that it effectively permits cities and

3  states to favor local businesses operating in a market Congress has attempted to eliminate, this

4  court cannot ignore federal law, and it cannot second-guess the Attorney General's or a local

5  prosecutor's decisions about how to allocate their limited resources.  The court thus **grants** the

6  city's motion to dismiss, and **denies** the plaintiffs' motion for a preliminary injunction.

7  **I.     BACKGROUND**

8      In 2016, California voters passed a ballot initiative known as Proposition 64, which

9  changed state laws that had made it a crime to use marijuana recreationally.  *See generally*

10  Control, Regulate and Tax Adult Marijuana Act, 2016 Cal. Legis. Serv. A-92 (West).  Many local

11  governments within California, including Sacramento, then began passing regulations and

12  ordinances about where and how marijuana could be produced, sold and used.  The Sacramento

13  City Council adopted what it called the "CORE" Program, for "Cannabis Opportunity

14  Reinvestment and Equity."  *See* Sacramento City Council Res. No. 2020-0338 (Oct. 13, 2020) &

15  No. 2018-0323 (Aug. 9, 2018).  The purpose of the CORE program is reducing "barriers of entry

16  and participation" in the cannabis industry to those who "have been negatively impacted by the

17  disproportionate law enforcement of cannabis related crimes."  Res. No. 2018-0323 at 19.  Under

18  this program, a person cannot obtain a permit to operate a cannabis dispensary in Sacramento

19  unless that person is a "current or former resident," among other requirements.  *See id.* at 23; Res.

20  No. 2020-338.

21      Peridot Tree, Inc., is a California company.  First Am. Compl. ¶ 1, ECF No. 12.  Kenneth

22  Gay is its majority shareholder.  *Id.* ¶ 2.  They applied for a dispensary license and asked to

23  participate in the process, but the City rejected their application because Gay has never lived in

24  Sacramento.  *See id.* ¶¶ 17–22.  According to his complaint, he otherwise meets the requirements

25  of the CORE program.  *Id.* ¶¶ 18–19.  Peridot and Gay filed this lawsuit after the City rejected

26  their permit application.  *See id.* ¶ 22.  They claim the City's program is unconstitutional

27  because it discriminates against out-of-state applicants, and they seek declaratory judgment to the

28  same effect.  *Id.* ¶¶ 23–31.  In addition to a declaration, their complaint requests damages, an

2

1    injunction, costs, fees, and whatever other relief the court deems appropriate.  *Id.* at 10 (prayer for

2    relief).

3         The City moved to dismiss the complaint for failure to state a claim; Peridot and Gay then

4    sought a preliminary injunction barring the City from issuing licenses under its CORE program.

5    Both motions are fully briefed.[1]  The court also directed the parties to submit supplemental briefs

6    about whether the court should abstain from adjudicating their dispute, which the parties filed.[2]

7    After a hearing, the court determined it had jurisdiction over the dispute but declined to exercise

8    that jurisdiction and stayed the case.  *See* Prev. Order, ECF No. 36.  Peridot and Gay appealed,

9    and the Ninth Circuit held this court could not abstain.  *See Peridot Tree, Inc. v. City of*

10   *Sacramento*, 94 F.4th 916, 935–36 (2024).  But the circuit took care to make clear it was not

11   weighing in on the merits of the parties' underlying dispute and the dormant Commerce Clause.

12   *See id.* at 936 & n.10.  On remand, this court permitted the parties to file supplemental briefs,

13   which they have now done, and the court held a further hearing.  *See* Mins., ECF No. 50; Pls.'

14   Suppl. Br. on Remand, ECF No. 55; Defs.' Suppl. Br. on Remand, ECF No. 52.  Jeffrey Jenson

15   appeared for Gay and Peridot, and Andrea Velasquez appeared for the defense.

16   **II.    DISCUSSION**

17        The parties' most fundamental dispute after remand is whether the Constitution prohibits

18   state and local governments from giving local marijuana businesses and entrepreneurs advantages

19   over non-local competitors.  There is no obvious answer.  Neither the Ninth Circuit nor the

20   Supreme Court has weighed in, and the question has divided other federal courts.  Many of these

21   courts have written thorough and thoughtful decisions, which the parties have summarized well in

22   their post-remand briefs.  The court here summarizes the most persuasive arguments for each

23   side.

---

[1] *See generally* Mot. Dismiss, ECF No. 13; Mem. Dismiss, ECF No. 13-1; Opp'n Dismiss, ECF No. 15; Reply Dismiss, ECF No. 17; Mot. Prelim. Inj., ECF No. 26; Opp'n Prelim. Inj., ECF No. 28; Reply Prelim. Inj., ECF No. 29.

[2] *See generally* Order (May 17, 2022), ECF No. 19; Pls.' Suppl. Abstention Br., ECF No. 21; Defs.' Suppl. Abstention Br., ECF No. 20.

1    The first of these arguments begins with the motivation behind the constitutional rule at

2  the basis of Peridot's and Gay's complaint, which rests on the "dormant" Commerce Clause.  The

3  Commerce Clause gives Congress "Power . . . To regulate Commerce with foreign Nations, and

4  among the several States, and with the Indian Tribes."  U.S. Const. art. I, § 8, cl. 3.  The dormant

5  Commerce Clause is a prohibition the Supreme Court has long inferred from the Commerce

6  Clause and its history.  Under that rule, the Constitution implicitly "prohibits state laws that

7  unduly restrict interstate commerce" and "preserves a national market for goods and services."

8  *Tenn. Wine & Spirits*, 588 U.S. at 514.

9    "[R]emoving state trade barriers was a principal reason for the adoption of the

10  Constitution."  *Id.* at 515.  States had "notoriously obstructed the interstate shipment of goods."

11  *Id.*  "[I]n order to succeed, the new Union would have to avoid the tendencies toward economic

12  Balkanization that had plagued relations among the Colonies and later among the States under the

13  Articles of Confederation."  *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (quoting *Hughes v.*

14  *Oklahoma*, 441 U.S. 322, 325–26 (1979)).  The purpose of these efforts, as the Supreme Court

15  once wrote, was to ensure that "every farmer and every craftsman shall be encouraged to produce

16  by the certainty that he will have free access to every market in the Nation, that no home

17  embargoes will withhold his exports, and no foreign state will by customs duties or regulations

18  exclude them."  *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539 (1949).  "In light of this

19  background, it would be strange if the Constitution contained no provision curbing state

20  protectionism, and at this point in the Court's history, no provision other than the Commerce

21  Clause could easily do the job."  *Tenn. Wine & Spirits*, 588 U.S. at 516.  And so, today, "if a state

22  law discriminates against out-of-state goods or nonresident economic actors, the law can be

23  sustained only on a showing that it is narrowly tailored to 'advance a legitimate local purpose.'"

24  *Id.* at 518 (alterations omitted) (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338

25  (2008)).

26    This rule generally makes good sense in cases about a variety of interstate markets, from

27  live bait to hydroelectric power, and even in rather abstract disputes about the incentives created

28  by a state's system for taxing personal income.  *See generally*, *e.g.*, *id.* (alcoholic drinks);

4

1    *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542 (2015) (personal income tax); *New*

2    *Energy Co. of Ind. v. Limbach*, 486 U.S. 269 (1988) (motor vehicle fuel); *Maine v. Taylor*,

3    477 U.S. 131 (1986) (live bait); *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982)

4    (hydroelectric power).  But the dormant Commerce Clause is an odd choice of legal doctrine to

5    apply to the interstate marijuana market.  By virtue of Congress's decision to place marijuana in

6    Schedule I of the Controlled Substances Act, "the manufacture, distribution, or possession of

7    marijuana became a criminal offense."  *Gonzales*, 545 U.S. at 14.  Could it be for a federal court

8    to infer from the Commerce Clause that the Constitution protects the free flow of commerce in a

9    market that Congress has made criminal?  Many other federal courts have concluded in recent

10   years that the answer must be no.  *See, e.g.*, *Jensen v. Md. Cannabis Admin.*, 719 F. Supp. 3d 466,

11   480, 483–85 (D. Md. Feb. 27, 2024), *appeal filed*, No. 24-1216 (4th Cir. Mar. 13, 2024);

12   *Variscite NY Four, LLC v. N.Y. State Cannabis Control Bd.*, No. 23-01599, 2024 WL 406490, at

13   *12 (N.D.N.Y. Feb. 2, 2024), appeal filed, No. 24-384 (2d Cir. Feb. 15, 2024); *Brinkmeyer v.*

14   *Wash. State Liquor & Cannabis Bd.*, No. 20-5661, 2023 WL 1798173, at *10–11 (W.D. Wash.

15   Feb. 7, 2023), *appeal dismissed*, No. 23-35162 (9th Cir. Apr. 11, 2023); *Original Invs., LLC v.*

16   *State*, 542 F. Supp. 3d 1230, 1234–36 (W.D. Okla. 2021).[3]

17          This is certainly not the first case about commerce in an illegal interstate market, but

18   relatively few cases predate the marijuana disputes that have arisen in recent years.  One of the

19   few older cases was about the Crime Control Act of 1994, which made it a federal crime for some

20   businesses "knowingly to transmit in interstate commerce information for the purpose of

21   procuring interests in an out-of-state lottery."  *Pic-A-State PA, Inc. v. Commonwealth of*

22   *Pennsylvania*, 42 F.3d 175, 177–78 (3d Cir. 1994) (citing Violent Crime Control and Law

23   Enforcement Act of 1994, Pub. L. No. 103–322, § 320905, 108 Stat. 1796, 2126).  A

---

[3] This court also rejected a constitutional challenge to the federal scheduling of marijuana in 2015.  *See United States v. Pickard*, 100 F. Supp. 3d 981, 988 (E.D. Cal. 2015) ("Having approached defendants' constitutional challenges to marijuana's Schedule I status with an open mind, the court had to be prepared to grant their motion to dismiss if the law and facts supported that decision.  At some point in time, in some court, the record may support granting such a motion.  But having carefully considered the facts and the law as relevant to this case, the court concludes that on the record in this case, this is not the court and this is not the time.").

1  Pennsylvania law similarly barred sales of "any interest in a lottery of another state or

2  government." *Id.* at 177 (quoting Pa. Stat. Ann. tit. 72, § 3761-9(c) (Supp. 1994)).  A

3  Pennsylvania company argued the state law was unconstitutional under the Commerce Clause.

4  *See id.*  The district court enjoined the state law, and the Third Circuit reversed.  *See id.* at 177,

5  180.  "Where Congress has proscribed certain interstate commerce," it wrote, "Congress has

6  determined that that commerce is not in the national interest."  *Id.* at 179.  "[I]t does not offend

7  the purpose of the Commerce Clause for states to discriminate or burden that commerce."  *Id.*  If

8  that rule governs this case, Sacramento's CORE program would stand.

9        But there are important differences between the Commerce Clause, on the one hand,

10  which gives Congress its own affirmative powers—such as the power to pass the Controlled

11  Substances Act—and the dormant Commerce Clause, on the other hand, which implicitly limits

12  what states and local governments can do.  The First Circuit Court of Appeals made this

13  observation in a case about medical marijuana dispensaries in 2022.  *See Ne. Patients Grp. v.*

14  *United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542, 548–50 (1st Cir. 2022).  Put

15  another way, the Commerce Clause "bounds the power of Congress," whereas the dormant

16  Commerce Clause limits "only the powers of the states."  *Prudential Ins. Co. v. Benjamin*,

17  328 U.S. 408, 423 (1946).  It is one thing to ask whether Congress has preempted a state law; it is

18  another to ask whether states can interfere with interstate commerce.  *See, e.g.*, *Ne. Patients Grp.*,

19  45 F.4th at 548 ("[P]reemption by a federal statute and prohibition by the dormant Commerce

20  Clause are distinct rather than coterminous means by which federal law may limit state

21  lawmaking that substantially burdens interstate commerce.").  In this sense, Congress's decision

22  to employ its Commerce Clause power to regulate interstate marijuana markets does not

23  necessarily demonstrate that states and local governments are freed from any limits imposed by

24  the dormant Commerce Clause.  *See id.*

25        Although this distinction is logically sound, it is hard to make it fit a case like this one.

26  No one contends Congress lacked authority as a general matter to impose criminal penalties on

27  those who distribute marijuana.  The Supreme Court has in fact confirmed Congress was acting

28  within its constitutional authority under the Commerce Clause when it passed the Controlled

1   Substances Act and added marijuana to the list of substances that are subject to the strictest

2   federal criminal prohibitions.  *See Raich*, 545 U.S. at 22.  Nor does anyone suggest in this case

3   that the Controlled Substances Act preempts Sacramento's CORE program or its local

4   preferences.  Rather, both sides are assuming, one way or another, that the Controlled Substances

5   Act is no obstacle to their plans.  The City contends it has authority to put the CORE program

6   into practice despite any federal prohibitions.  Peridot and Gay presumably would rather avoid a

7   federal indictment.

8          Rather, the disjunction in this case follows from the implicit assumption underlying the

9   Supreme Court's dormant Commerce Clause cases—that the market in question is a legal or

10  desirable one, as the dissenting judge observed in a First Circuit case also involving marijuana,

11  albeit medical marijuana dispensaries, *Ne. Patients Grp.  See* 45 F.4th at 558–59 (Gelpí, J.

12  dissenting).  In this case, it would defy common sense "to find that the dormant Commerce

13  Clause, drawn from Congress' power to regulate interstate commerce, prevents the states from

14  passing laws which inhibit a market which Congress has already declared prohibited." *Jensen*,

15  719 F. Supp. 3d at 483.  It is true, as the First Circuit majority concluded in the *Northeast*

16  *Patients Group* case, that Congress's decision to regulate a particular market does not inherently

17  displace the dormant Commerce Clause prohibition.  *See* 45 F.4th at 549.  But in the case of the

18  interstate market for marijuana, medical or recreational, it is difficult to see what Congress

19  intended to leave of that market, at this time, given the provisions of the Controlled Substances

20  Act.  Congress has exercised its Commerce Clause authority to prohibit the private, local, non-

21  commercial cultivation and use of marijuana for medical purposes, even when in compliance with

22  state law.  *See Raich*, 545 U.S. at 7, 19.  As the Supreme Court has found, Congress intended to

23  "eliminat[e] commercial transactions in the interstate market in their entirety." *Id.* at 19.  In short,

24  there is no permissible interstate market to protect from state interference.

25         Underscoring the mismatch between this case and the traditional dormant Commerce

26  Clause rule, other federal courts around the country have struggled when governmental

27  defendants have asked them to apply an exception to the dormant Commerce Clause's prohibition

28  in marijuana cases.  Ordinarily, "[w]hen a state statute directly regulates or discriminates against

7

1    interstate commerce, or when its effect is to favor in-state economic interests over out-of-state

2    interests, [federal courts] have generally struck down the statute without further inquiry." *Brown-*

3    *Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986).  But "Congress

4    may use its powers under the Commerce Clause to 'confer upon the States an ability to restrict the

5    flow of interstate commerce that they would not otherwise enjoy.'" *New England Power Co.*,

6    455 U.S. at 340 (alterations omitted) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 44

7    (1980)).  Some courts thus have considered whether the Controlled Substances Act permits states

8    to "restrict the flow of commerce" by passing protectionist marijuana distribution laws.  *See, e.g.*,

9    *Ne. Patients Grp.*, 45 F.4th at 551–56; *Brinkmeyer*, 2023 WL 1798173, at *11–13.

10           But there are no clear answers to this question.  One reason is that for the exception to

11   apply, Congress must make its intentions "unmistakably clear."  *Taylor*, 477 U.S. at 138–39

12   (quoting *S. Pac. Co. v. Ariz. ex re. Sullivan*, 325 U.S. 761, 769 (1945)).  This requirement makes

13   sense in cases about legal markets.  Because "the free flow of interstate trade" played such an

14   "important role" in the states' original decision to unite, courts demand clarity from Congress

15   when it decides to promote some other interest instead.  *See id.*  But a clear statement seems an

16   absurd demand to make of Congress when it has criminalized a market—a clear enough statement

17   to the contrary.  We cannot "expect Congress to speak out of both sides of its mouth on this issue,

18   simultaneously illegalizing marijuana while affirmatively granting states the power to 'burden

19   interstate commerce in a manner which would otherwise not be permissible.'" *Ne. Patients Grp.*,

20   45 F.4th at 559 (Gelpí, J., dissenting) (quoting *New England Power Co.*, 455 U.S. at 341).  Courts

21   also have found the congressional permission exception a poor fit for marijuana cases because the

22   parties invoking the exception are the states and local governments who would like to permit and

23   encourage local marijuana markets.  "[I]t can hardly be said that a state effort to protect a market

24   in medical marijuana from out-of-state competition necessarily advances Congress's evident goal

25   . . . of preventing entry into that market." *Id.* at 554 (majority op.).  The Congressional

26   permission exception simply does not fit in marijuana cases, further supporting the conclusion the

27   dormant Commerce Clause simply is not designed for cases about illegal interstate markets.

1      That said, this court acknowledges that some of the Supreme Court's own decisions

2  suggest the dormant Commerce Clause applies very broadly, perhaps even to markets for illegal

3  substances.  For example, in *City of Philadelphia v. New Jersey*, the Court considered whether the

4  dormant Commerce Clause invalidated a New Jersey law that prohibited imports of "any solid or

5  liquid waste" without the state's approval.  *See* 437 U.S. 617, 618–19 (1978).  The Supreme

6  Court held that even though New Jersey was attempting quite literally to keep other states'

7  garbage out, its law fell "squarely within the area that the Commerce Clause puts off limits to

8  state regulation."  *Id.* at 628.  The Commerce Clause applies to "efforts by one State to isolate

9  itself in the stream of interstate commerce from a problem shared by all."  *Id.* at 629.  "All objects

10  of interstate trade merit Commerce Clause protection; none is excluded by definition at the

11  outset."  *Id.* at 622; *see also, e.g.*, *Granholm*, 544 U.S. at 472 (stating without qualification that

12  "[r]ivalries among the States are thus kept to a minimum, and a proliferation of trade zones is

13  prevented"); *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 340 & n.3 (1992) (confirming

14  interstate commerce in "solid waste" with "particularly noxious and dangerous propensities" was

15  subject to dormant Commerce Clause rule, even if waste had "no value").  Adopting this mode of

16  reasoning, the First Circuit majority in *Northeast Patients Group* believed that courts should not

17  "ignore the potential for a trade war to be destructive whenever its genesis could be traced to a

18  single state's effort to attain predominance in a market that federal law deems unlawful."

19  45 F.4th at 553.  "The potential for any trade war—including one started in that way—to escalate

20  and have knock-on effects would seem rather strongly to counsel against" limiting the dormant

21  Commerce Clause to legitimate or conventional markets.  *Id.*

22      While understanding the argument well, this court is not persuaded because it does not

23  overcome the simple fact that Congress long ago passed a comprehensive criminal law with the

24  intent of eliminating all commercial marijuana transactions, and Congress has never rescinded that

25  law despite repeated suggestions that it should.  While it is possible in the meantime a broader

26  trade war could begin with a dispute about marijuana distribution, no party has cited evidence to

27  show an interstate trade war is at risk of erupting.  And even if a dispute about marijuana markets

28  did spill over into other markets—including those unencumbered by the

9

1   Controlled Substances Act—then the parties to that broader dispute could ask the courts to

2   intervene.  The Controlled Substances Act likely would be no hurdle to a case about such a

3   broader dispute.  If, over time, Congress grew concerned—in a way it has not to date—that

4   marijuana conflicts were frequently erupting into unacceptable trade wars, it could amend the

5   Controlled Substances Act or pass other legislation.

6          Relatedly, as noted in the introduction of this order, courts have pointed out the Controlled

7   Substances Act, even if not rescinded or amended, is no longer the broad and comprehensive ban

8   it once was.  The Executive and Legislative branches have taken conflicting and sometimes

9   ambiguous positions about recreational and medical marijuana use.  *See, e.g.*, *Peridot Tree*,

10  94 F.4th at 923; *Ne. Patients Grp.*, 45 F.4th at 553; *Feinberg v. C.I.R.*, 808 F.3d 813, 814 (10th

11  Cir. 2015); *United States v. Canori*, 737 F.3d 181, 183–84 (2d Cir. 2013).  Since 2015, Congress

12  has barred the United States Department of Justice from using appropriated funds "to prevent any

13  [states] from implementing their own laws that authorize the use, distribution, possession, or

14  cultivation of medical marijuana."  *Ne. Patients Grp.*, 45 F.4th at 547–48 (quoting Consolidated

15  Appropriations Act, 2023, Pub. L. No. 117-103, § 531, 136 Stat. 49 (2022)); *see also*

16  Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, § 531, 138 Stat. 25 (2024).  For

17  many years, the Department of Justice has issued similar guidance to local prosecutors, counseling

18  them not to devote resources to prosecutions against people who have complied with state

19  marijuana laws, for example.  *See Peridot Tree*, 94 F.4th at 923–24.  The President of the United

20  States has "pardoned all U.S. citizens and lawful permanent residents who 'committed the offense

21  of simple possession of marijuana in violation of the Controlled Substances Act.'"  *Id.* at 924

22  (quoting Proclamation No. 10467, 87 Fed. Reg. 61,441 (Oct. 6, 2022)).  The same Administration

23  also proposed to move marijuana from Schedule I to Schedule III.  *See* U.S. Dep't of Justice,

24  "Justice Department Submits Proposed Regulation to Reschedule Marijuana" (May 16, 2024).[4]

25  And as Peridot and Gay point out, Congress confirmed Merrick Garland as Attorney General after

26  he made clear he did not anticipate devoting resources to the prosecution of "those

---

[4] https://www.justice.gov/opa/pr/justice-department-submits-proposed-regulation-reschedule-marijuana (visited Nov. 20, 2024).

1    who are complying with the laws in states that have legalized and are effectively regulating

2    marijuana." Pls.' Suppl. Brief on Remand at 7–8.

3        In addition to these and other "mixed messages" from the federal government, *Feinberg*,

4    808 F.3d at 814, courts also have contended with the reality that interstate marijuana markets

5    appear to have thrived despite the purportedly strict federal prohibition. *See, e.g.*, *Ne. Patients*

6    *Grp.*, 45 F.4th at 547–48. This trend appears to have begun even before the Supreme Court

7    issued its decision in *Raich* in 2005. At least nine states, including California, had by then

8    authorized the use of marijuana for medicinal purposes. *See* 545 U.S. 5 & n.1. California's

9    authorization dates to the 1990s. *See id.* at 5 & n.3.

10       There may be some point at which the federal criminal prohibition loses meaning or force

11   by falling to "desuetude." *Cf., e.g.*, *Poe v. Ullman*, 367 U.S. 497, 501–02, 508–09 (1961)

12   (declining to adjudicate constitutional dispute about state-law contraceptive ban that had not been

13   enforced for "more than three-quarters of a century since its enactment"); *United States v. Elliott*,

14   266 F. Supp. 318, 325–26 (S.D.N.Y. 1967) (describing desuetude as "civil law doctrine rendering

15   a statute abrogated by reason of its long and continued non-use"). But it is unclear when that

16   point might arrive, if ever. *Cf., e.g.*, Ebba Brunnstrom, *Abortion and the Mails: Challenging the*

17   *Applicability of the Comstock Act Laws Post-Dobbs*, 55 Colum. Hum. Rts. L. Rev. 1, 23 (2023)

18   ("The idea of desuetude is compelling, especially for those unenforced statutes that implicate

19   fairness and morality, but the doctrine has no history of real application in the context of criminal

20   law."); Hillary Greene, *Undead Laws: The Use of Historically Unenforced Criminal Statutes in*

21   *Non-Criminal Litigation*, 16 Yale L. & Pol'y Rev. 169, 169 (1997) ("The American legal system

22   has yet to develop a coherent policy delineating when or if historically unenforced penal statutes

23   can be invoked in non-penal contexts."). On this record, it is impossible to conclude we as a

24   society have arrived there. As noted, Congress has not repealed or modified the Controlled

25   Substances Act. Neither the Legislative nor Executive branch has changed the scheduling of

26   marijuana in a way that permits interstate commercial distribution for both recreational and

27   medical use. *See, e.g.*, *Brinkmeyer*, 2023 WL 1798173, at *12. Nor do federal prosecutors

28   eliminate a criminal prohibition by exercising their discretion and allocating resources away from

1    investigating and prosecuting some marijuana offenses.  *See, e.g.*, *Jensen*, 719 F. Supp. 3d at

2    484–85.

3            Finally, the court hesitates to employ its equitable powers as Peridot and Gay request.

4    *See* First. Am. Compl. ¶¶ 28, 31 (requesting injunctive and declaratory relief).  Federal district

5    courts cannot employ their equitable powers if doing so would effectively revisit decisions

6    Congress made when it passed the Controlled Substances Act.  *United States v. Oakland*

7    *Cannabis Buyers' Co-Op*, 532 U.S. 483, 497–98 (2001).  "[A] court sitting in equity cannot

8    'ignore the judgment of Congress, deliberately expressed in legislation.'"  *Id.* at 497 (quoting

9    *Virginian R. Co. v. Ry. Emps*, 300 U.S. 515, 551 (1937)).

10   **III.   CONCLUSION**

11           This court joins those that have concluded "[t]he dormant Commerce Clause does not

12   apply to federally illegal markets" because "Congress has clearly stated its intent for no interstate

13   cannabis market to exist."  *Brinkmeyer*, 2023 WL 1798173, at *13.  The court **dismisses the**

14   **complaint without leave to amend**, and **denies** the motion for a preliminary injunction **as moot**.

15   The Clerk of Court is directed to **close** this case.

16           This order resolves ECF Nos. 13, 26.

17           IT IS SO ORDERED.

18   DATED:  November 20, 2024.

_____
SENIOR UNITED STATES DISTRICT JUDGE